SINGLETON, CHIEF, BUREAU OF MEDICAL
SERVICES, DEPARTMENT OF HEALTH AND
WELFARE OF MISSOURI *v.* WULFF ET AL.

No. 74–1393. Argued March 23, 1976—Decided July 1, 1976

*Michael L. Boicourt,* Assistant Attorney General of Missouri, argued the cause for petitioner. With him on the brief was *John C. Danforth,* Attorney General.

*Frank Susman* argued the cause and filed a brief for respondents.

MR. JUSTICE BLACKMUN delivered the opinion of the Court (Parts I, II–A, and III) together with an opinion (Part II–B), in which MR. JUSTICE BRENNAN, MR. JUSTICE WHITE, and MR. JUSTICE MARSHALL joined.

Like its companions,[1] this case involves a claim of a State's unconstitutional interference with the decision to terminate pregnancy. The particular object of the challenge is a Missouri statute excluding abortions that are not "medically indicated" from the purposes for which Medicaid benefits are available to needy persons. In its present posture, however, the case presents two issues not going to the merits of this dispute. The first is whether the plaintiff-appellees, as physicians who perform nonmedically indicated abortions, have standing to maintain the suit, to which we answer that they do. The second is whether the Court of Appeals, exercising jurisdiction because the suit had been dismissed in the District Court for lack of standing, properly proceeded to a determination of the merits, to which we answer that it did not.

I

Missouri participates in the so-called Medicaid program, under which the Federal Government partially underwrites qualifying state plans for medical assistance to the needy. See 42 U. S. C. § 1396 et seq. (1970 ed. and Supp. IV). Missouri's plan, which is set out in Mo. Rev. Stat. §§ 208.151–208.158 (Supp. 1975), includes, in § 208.152, a list of 12 categories of medical services that are eligible for Medicaid funding. The last is:

"(12) Family planning services as defined by federal rules and regulations; provided, however, that such family planning services shall not in-

---

[1] *Planned Parenthood of Missouri* v. *Danforth, ante,* p. 52, *Bellotti* v. *Baird, post,* p. 132.

clude abortions unless such abortions are medically indicated."

This provision is the subject of the litigation before us.[2]

The suit was filed in the United States District Court for the Eastern District of Missouri by two Missouri-licensed physicians. Each plaintiff avers, in an affidavit filed in opposition to a motion to dismiss, that he "has provided, and anticipates providing abortions to welfare patients who are eligible for Medicaid payments." App. 32, 36.[3] The plaintiffs further allege in their affidavits that all Medicaid applications filed in connection with abortions performed by them have been refused by the defendant, who is the responsible state official,[4] in reliance on the challenged § 208.152 (12). App. 32, 36. It is not entirely clear who has filed these applications. One affiant states that "he and [his] patients have been refused," id., at 32; the other refers to "those who have submitted applications for such payments on his behalf" and states that such "payments have been refused." Id., at 36. Indeed, it is not entirely clear to whom the payments would go if they were made. We assume, however, from the statute's several references to payments "on behalf of" eligible persons, see §§ 208.151 and 208.-152, that the provider of the services himself seeks

---

[2] The complaint contained two additional counts directed against the Missouri State Board of Registration for the Healing Arts, and concerning other Missouri statutes relating to abortions upon minors. The District Court's dismissal of those counts has not been appealed and is not now before us.

[3] Plaintiffs sued on their own behalf and on behalf of the class of similarly situated physicians. App. 15. Apparently, however, the suit was dismissed by the District Court before any such class was certified.

[4] Defendant Singleton, petitioner herein, is Chief of the Bureau of Medical Services in the Division of Welfare of Missouri's Department of Public Health and Welfare. Id., at 16.

reimbursement from the State. In any event, each plaintiff states that he anticipates further refusals by the defendant to fund nonmedically indicated abortions. Each avers that such refusals "deter [him] from the practice of medicine in the manner he considers to be most expertise [*sic*] and beneficial for said patients . . . and chill and thwart the ordinary and customary functioning of the doctor-patient relationship." App. 32, 36.

The complaint sought a declaration of the statute's invalidity and an injunction against its enforcement. A number of grounds were stated, among them that the statute, "on its face and as applied," is unconstitutionally vague, "[d]eprives plaintiffs of their right to practice medicine according to the highest standards of medical practice"; "[d]eprives plaintiffs' patients of the fundamental right of a woman to determine for herself whether to bear children"; "[i]nfringes upon plaintiffs' right to render and their patients' right to receive safe and adequate medical advice and treatment"; and "[d]eprives plaintiffs and their patients, each in their own classification, of the equal protection of the laws." *Id.*, at 16, 12–13.

The defendant's sole pleading in District Court was a pre-answer motion to dismiss. Dismissal was sought upon several alternative grounds: that there was no case or controversy; that the plaintiffs lacked "standing to litigate the constitutional issues raised"; that injunctive relief "cannot be granted" because of absence of "irreparable harm" to the plaintiffs; that the plaintiffs "personally could suffer no harm"; and that in any case they "cannot litigate the alleged deprivation or infringement of the civil rights of their welfare patients." *Id.*, at 24–25.

The plaintiffs having responded to this motion with a memorandum and also with the affidavits described

above, the three-judge panel that had been convened to hear the case dismissed the count now before us "for lack of standing." The court saw no "logical nexus between the status asserted by the plaintiffs and the claim they seek to have adjudicated." *Wulff* v. *State Bd. of Registration for Healing Arts,* 380 F. Supp. 1137, 1144 (1974).

The United States Court of Appeals for the Eighth Circuit reversed. 508 F. 2d 1211 (1974). It reasoned that *Roe* v. *Wade,* 410 U. S. 113 (1973), and *Doe* v. *Bolton,* 410 U. S. 179 (1973), as interpreted in several of its own earlier decisions, had " 'paved the way for physicians to assert their constitutional rights to practice medicine,' " citing *Nyberg* v. *City of Virginia,* 495 F. 2d 1342, 1344 (CA8), appeal dismissed and cert. denied, 419 U. S. 891 (1974). Those rights were said to include " 'the right to advise and perform abortions,' " and furthermore to be " 'inextricably bound up with the privacy rights of women who seek abortions.' " 508 F. 2d, at 1213. Clearly, the restriction of Medicaid benefits affected the plaintiff physicians "both professionally and monetarily." *Id.,* at 1214. The result, in the Court of Appeals' view, was that they had alleged sufficient " 'injury in fact,' " and also an interest " 'arguably within the zone of interests to be protected . . . by the . . . constitutional guarantee in question,' " *ibid.,* quoting *Data Processing Service* v. *Camp,* 397 U. S. 150, 153 (1970).

Although it found the matter "not without its difficulty," 508 F. 2d, at 1214, the Court of Appeals next concluded that, being "urged by appellants" (respondents here), it should proceed from the standing question to the merits of the case. This, rather than a remand, it considered proper because the question of the statute's validity could not profit from further refinement, and indeed was one whose answer was in no doubt. The

statute was "obviously unconstitutional," and it therefore appeared "that the case might well have been decided by one federal judge." *Id.*, at 1215. The court, accordingly, chose "to make final determination of this case." *Ibid.* Proceeding to the merits, the court found a "clear violation of the Equal Protection Clause." *Ibid.* The statute constituted a "special regulation on abortion," and discriminated against both the patient and the physician "by reason of the patient's poverty." *Id.*, at 1215–1216. Section 208.152 (12) was therefore declared unconstitutional by the Court of Appeals. Injunctive relief was felt to be unnecessary, it being assumed that the State would comply with the declaration and cease any discrimination between needy patients seeking therapeutic and nontherapeutic abortions. 508 F. 2d, at 1213–1216. We granted certiorari, limited to the two questions identified in the opening paragraph of this opinion. 422 U. S. 1041 (1975).

## II

Although we are not certain that they have been clearly separated in the District Court's and Court of Appeals' opinions, two distinct standing questions are presented. We have distinguished them in prior cases, *e. g., Data Processing Service* v. *Camp*, 397 U. S., at 152–153; *Flast* v. *Cohen*, 392 U. S. 83, 99 n. 20 (1968); *Barrows* v. *Jackson*, 346 U. S. 249, 255 (1953), and they are these: First, whether the plaintiff-respondents allege "injury in fact," that is, a sufficiently concrete interest in the outcome of their suit to make it a case or controversy subject to a federal court's Art. III jurisdiction, and, second, whether, as a prudential matter, the plaintiff-respondents are proper proponents of the particular legal rights on which they base their suit.

A. The first of these questions needs little comment, for there is no doubt now that the respondent-physicians

suffer concrete injury from the operation of the challenged statute. Their complaint and affidavits, described above, allege that they have performed and will continue to perform operations for which they would be reimbursed under the Medicaid program, were it not for the limitation of reimbursable abortions to those that are "medically indicated." If the physicians prevail in their suit to remove this limitation, they will benefit, for they will then receive payment for the abortions. The State (and Federal Government) will be out of pocket by the amount of the payments. The relationship between the parties is classically adverse, and there clearly exists between them a case or controversy in the constitutional sense. *Simon* v. *Eastern Ky. Welfare Rights Org.,* 426 U. S. 26, 37–39 (1976); *Investment Co. Institute* v. *Camp,* 401 U. S. 617, 620–621 (1971); *Data Processing Service* v. *Camp,* 397 U. S., at 151–156.

B. The question of what rights the doctors may assert in seeking to resolve that controversy is more difficult. The Court of Appeals adverted to what it perceived to be the doctor's own "constitutional rights to practice medicine." 508 F. 2d, at 1213. We have no occasion to decide whether such rights exist. Assuming that they do, the doctors, of course, can assert them. It appears, however, that the Court of Appeals also accorded the doctors standing to assert, and indeed granted them relief based partly upon, the rights of their patients. We must decide whether this assertion of *jus tertii* was a proper one.

Federal courts must hesitate before resolving a controversy, even one within their constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation. The reasons are two. First, the courts should not adjudicate such rights unnecessarily, and it may be that in fact the holders of those

rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not. See *Ashwander* v. *TVA*, 297 U. S. 288, 345–348 (1936) (Brandeis, J., concurring) (offering the standing requirement as one means by which courts avoid unnecessary constitutional adjudications). Second, third parties themselves usually will be the best proponents of their own rights. The courts depend on effective advocacy, and therefore should prefer to construe legal rights only when the most effective advocates of those rights are before them. The holders of the rights may have a like preference, to the extent they will be bound by the courts' decisions under the doctrine of *stare decisis.* See, *e. g., Baker* v. *Carr,* 369 U. S. 186, 204 (1962) (standing requirement aimed at "assur[ing] that concrete adverseness which sharpens the presentation of the issues upon which the court so largely depends"); *Holden* v. *Hardy,* 169 U. S. 366, 397 (1898) (assertion of third parties' rights would come with "greater cogency" from the third parties themselves). These two considerations underlie the Court's general rule: "Ordinarily, one may not claim standing in this Court to vindicate the constitutional rights of some third party." *Barrows* v. *Jackson,* 346 U. S., at 255. See also *Flast* v. *Cohen,* 392 U. S., at 99 n. 20; *McGowan* v. *Maryland,* 366 U. S. 420, 429 (1961).

Like any general rule, however, this one should not be applied where its underlying justifications are absent. With this in mind, the Court has looked primarily to two factual elements to determine whether the rule should apply in a particular case. The first is the relationship of the litigant to the person whose right he seeks to assert. If the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue, the court at least can be sure that its construction of

the right is not unnecessary in the sense that the right's enjoyment will be unaffected by the outcome of the suit. Furthermore, the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter. Thus in *Griswold* v. *Connecticut,* 381 U. S. 479 (1965), where two persons had been convicted of giving advice on contraception, the Court permitted the defendants, one of whom was a licensed physician, to assert the privacy rights of the married persons whom they advised. The Court pointed to the "confidential" nature of the relationship between the defendants and the married persons, and reasoned that the rights of the latter were "likely to be diluted or adversely affected" if they could not be asserted in such a case. *Id.,* at 481. See also *Eisenstadt* v. *Baird,* 405 U. S. 438, 445–446 (1972) (stressing "advocate" relationship and "impact of the litigation on the third-party interests"); *Barrows* v. *Jackson,* 346 U. S., at 259 (owner of real estate subject to racial covenant granted standing to challenge such covenant in part because she was "the one in whose charge and keeping repose[d] the power to continue to use her property to discriminate or to discontinue such use"). A doctor-patient relationship similar to that in *Griswold* existed in *Doe* v. *Bolton,* where the Court also permitted physicians to assert the rights of their patients.[5] 410 U. S., at 188–189. Indeed, since that right was the right to an abortion, *Doe* would flatly control the instant case were it not for the fact that there the physicians were seeking protection from possible criminal prosecution.

The other factual element to which the Court has looked is the ability of the third party to assert his own

---

[5] We have reiterated that holding today in *Planned Parenthood of Missouri* v. *Danforth, ante,* at 62.

right. Even where the relationship is close, the reasons for requiring persons to assert their own rights will generally still apply. If there is some genuine obstacle to such assertion, however, the third party's absence from court loses its tendency to suggest that his right is not truly at stake, or truly important to him, and the party who is in court becomes by default the right's best available proponent. Thus, in *NAACP* v. *Alabama,* 357 U. S. 449 (1958), the Court held that the National Association for the Advancement of Colored People, in resisting a court order that it divulge the names of its members, could assert the First and Fourteenth Amendments rights of those members to remain anonymous. The Court reasoned that "[t]o require that [the right] be claimed by the members themselves would result in nullification of the right at the very moment of its assertion." *Id.,* at 459. See also *Eisenstadt* v. *Baird,* 405 U. S., at 446; *Barrows* v. *Jackson,* 346 U. S., at 259.[6]

---

[6] MR. JUSTICE POWELL objects that such an obstacle is not enough, that our prior cases allow assertion of third-party rights only when such assertion by the third parties themselves would be "in all practicable terms impossible." *Post,* at 126. Carefully analyzed, our cases do not go that far. The Negro real-estate purchaser in *Barrows,* if he could prove that the racial covenant alone stood in the way of his purchase (as presumably he could easily have done, given the amicable posture of the seller in that case), could surely have sought a declaration of its invalidity or an injunction against its enforcement. The Association members in *NAACP* v. *Alabama* could have obtained a similar declaration or injunction, suing anonymously by the use of pseudonyms. The recipients of contraceptives in *Eisenstadt* (or their counterparts in *Griswold* and *Doe,* for that matter) could have sought similar relief as necessary to the enjoyment of their constitutional rights. The point is not that these were easy alternatives, but that they differed only in the degree of difficulty, if they differed at all, from the alternative in this case of the women themselves seeking a declaration or injunction that would force the State to pay the doctors for their abortions.

Application of these principles to the present case quickly yields its proper result. The closeness of the relationship is patent, as it was in *Griswold* and in *Doe*. A woman cannot safely secure an abortion without the aid of a physician, and an impecunious woman cannot easily secure an abortion without the physician's being paid by the State. The woman's exercise of her right to an abortion, whatever its dimension, is therefore necessarily at stake here. Moreover, the constitutionally protected abortion decision is one in which the physician is intimately involved. See *Roe* v. *Wade,* 410 U. S., at 153–156. Aside from the woman herself, therefore, the physician is uniquely qualified to litigate the constitutionality of the State's interference with, or discrimination against, that decision.

As to the woman's assertion of her own rights, there are several obstacles. For one thing, she may be chilled from such assertion by a desire to protect the very privacy of her decision from the publicity of a court suit. A second obstacle is the imminent mootness, at least in the technical sense, of any individual woman's claim. Only a few months, at the most, after the maturing of the decision to undergo an abortion, her right thereto will have been irrevocably lost, assuming, as it seems fair to assume, that unless the impecunious woman can establish Medicaid eligibility she must forgo abortion. It is true that these obstacles are not insurmountable. Suit may be brought under a pseudonym, as so frequently has been done. A woman who is no longer pregnant may nonetheless retain the right to litigate the point because it is " 'capable of repetition yet evading review.' " *Roe* v. *Wade,* 410 U. S., at 124–125. And it may be that a class could be assembled, whose fluid membership always included some women with live claims. But if the assertion of the right is to be "representative" to such

an extent anyway, there seems little loss in terms of effective advocacy from allowing its assertion by a physician.

For these reasons, we conclude that it generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision, and we decline to restrict our holding to that effect in *Doe* to its purely criminal context.[7] In this respect, the judgment of the Court of Appeals is affirmed.

---

[7] MR. JUSTICE POWELL would so limit *Doe,* and the other cases cited, explaining them as cases in which the State "directly interfered with the abortion decision" and "directly interdicted the normal functioning of the physician-patient relationship by criminalizing certain procedures." *Post,* at 128. There is no support in the language of the cited cases for this distinction, and we are given no logical reason why "direct" interference with a litigant's conduct should provide a special reason for allowing him to assert third-party rights. Moreover, a "direct interference" or "interdiction" test does not appear to be supported by precedent. We have allowed *jus tertii* assertion where the interference was no more direct than it is here. In *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925), for example, private schools were permitted to assert the rights of parents as against a state requirement that their children receive a public education, even though the private schools were not thereby "interdicted" at all, but only reduced to the role of supplementing the public school education. Conversely, we regularly *dis*allow *jus tertii* assertion even though the State has "interdicted" the litigant's conduct to the point of "criminalizing" it. See *Brown* v. *United States,* 411 U. S. 223, 230 (1973) (Fourth Amendment rights of others); *Broadrick* v. *Oklahoma,* 413 U. S. 601, 610 (1973) (rights of others to be free from application of same statute); *McGowan* v. *Maryland,* 366 U. S. 420, 429–430 (1961) (store owners convicted of violating Sunday closing laws could not assert religious liberty rights of customers). Finally, it is not clear why a "direct interference" or "interdiction" test would not allow the *jus tertii* assertion in this case. For a doctor who cannot afford to work for nothing, and a woman who cannot afford to pay him, the State's refusal to fund an abortion is as effective

## III

On this record, we do not agree, however, with the action of the Court of Appeals in proceeding beyond the issue of standing to a resolution of the merits of the case. Petitioner urges that this action was particularly inappropriate because the case is one in which the requested injunctive relief could be granted or denied on the merits only by a three-judge district court, with direct appeal here. We find it unnecessary to reach this contention, or the respondents' arguments that a three-judge court was not required because the statute is so patently unconstitutional and because in any event only declaratory relief is warranted. Quite apart from these considerations, the Court of Appeals' resolution of the merits

---

an "interdiction" of it as would ever be necessary. Furthermore, since the right asserted in this case is not simply the right to have an abortion, but the right to have abortions nondiscriminatorily funded, the denial of such funding is as complete an "interdiction" of the exercise of the right as could ever exist.

Mr. Justice Powell also voices the concern that our decision today will be "difficult to cabin," and threatens to allow "any provider of services . . . to assert his client's or customer's constitutional rights, if any, in an attack on a welfare statute that excludes from coverage his particular transaction." Post, at 129, 129–130. It is true that it is more difficult to predict the pattern of results in future cases when the Court elects to proceed, as it does today, by assessing relevant factors in individual cases (and we give no decisive or pre-eminent importance to any one of these factors), rather than by adopting a set of per se rules, such as those Mr. Justice Powell would apparently prefer based on the "direct interdiction" of the litigant's conduct and the impossibility of third-party assertion. Still, we cannot share the Justice's alarm. Unless the "provider of services" that he has in mind enjoys with his "client" a confidential relationship such as that of the doctor and patient, unless the "client's" claim is imminently moot, as the pregnant woman's technically is, the standing issue in such a future case will not be definitively controlled by this one. Beyond that, we simply decline to speculate on cases not before us.

seems to us to be an unacceptable exercise of its appellate jurisdiction.

As noted, with respect to the complaint's count that is before us, petitioner filed in the District Court only a pre-answer motion to dismiss for lack of standing. He filed no answer, and no other pleading addressed to the merits. He did answer some interrogatories, App. 26, but stipulated to no facts, and gave no intimation of what defenses, if any, he might have other than the plaintiffs' alleged lack of standing. The District Court granted his motion to dismiss and no more. That dismissal was the "final decision" appealed from, see 28 U. S. C. § 1291, and on appeal petitioner limited himself entirely to the standing determination that underlay it. In short, petitioner has never been heard in any way on the merits of the case.

It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below. In *Hormel* v. *Helvering,* 312 U. S. 552, 556 (1941), the Court explained that this is "essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues . . . [and] in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence." We have no idea what evidence, if any, petitioner would, or could, offer in defense of this statute, but this is only because petitioner has had no opportunity to proffer such evidence. Moreover, even assuming that there is no such evidence, petitioner should have the opportunity to present whatever legal arguments he may have in defense of the statute. We think he was justified in not presenting those arguments to the Court of Appeals, and in assuming, rather, that he would at least be allowed to answer the complaint, should the Court of Appeals reinstate it.

The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases. We announce no general rule. Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt, see *Turner* v. *City of Memphis*, 369 U. S. 350 (1962), or where "injustice might otherwise result." *Hormel* v. *Helvering*, 312 U. S., at 557.[8] Suffice it to say that this is not such a case. The issue resolved by the Court of Appeals has never been passed upon in any decision of this Court. This being so, injustice was more likely to be caused than avoided by deciding the issue without petitioner's having had an opportunity to be heard.

Assuming, therefore, that the Court of Appeals had jurisdiction to proceed to the merits in this case, we hold that it should not have done so. To that extent, its judgment is reversed, and the case is remanded with directions that it be returned to the District Court so that petitioner may file an answer to the complaint and the litigation proceed accordingly.

*It is so ordered.*

MR. JUSTICE STEVENS, concurring in part.

In this case (1) the plaintiff-physicians have a financial stake in the outcome of the litigation, and (2) they claim that the statute impairs their own constitutional rights. They therefore clearly have standing to bring this action.

Because these two facts are present, I agree that the analysis in Part II–B of MR. JUSTICE BLACKMUN's opinion provides an adequate basis for considering the arguments

---

[8] These examples are not intended to be exclusive.

based on the effect of the statute on the constitutional rights of their patients. Because I am not sure whether the analysis in Part II–B would, or should, sustain the doctors' standing, apart from those two facts, I join only Parts I, II–A, and III of the Court's opinion.

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE, MR. JUSTICE STEWART, and MR. JUSTICE REHNQUIST join, concurring in part and dissenting in part.

The Court holds that the respondents have standing to bring this suit and to assert their own constitutional rights, if any, in an attack on Mo. Rev. Stat. § 208.152 (12) (Supp. 1975). The Court also holds that the Court of Appeals erred in proceeding to the merits of respondents' challenge. I agree with both of these holdings and therefore concur in Parts I, II–A, and III of JUSTICE BLACKMUN's opinion, as well as in the first four sentences of Part II–B.

The Court further holds that after remand to the District Court the respondents may assert, in addition to their own rights, the constitutional rights of their patients who would be eligible for Medicaid assistance in obtaining elective abortions but for the exclusion of such abortions in § 208.152 (12). I dissent from this holding.

I

As the Court notes, *ante,* at 109–110, respondents by complaint and affidavit established their Art. III standing to invoke the judicial power of the District Court. They have performed abortions for which Missouri's Medicaid system would compensate them directly[1] if the challenged statutory section did not preclude it. Re-

---

[1] As the Court notes, *ante,* at 109–110, Missouri has structured its Medicaid system so that payments for medical services are made directly to the physician rather than to the patient.

spondents allege an intention to continue to perform such abortions, and that the statute deprives them of compensation. These arguments, if proved, would give respondents a personal stake in the controversy over the statute's constitutionality. See *Warth* v. *Seldin,* 422 U. S. 490, 498–499 (1975); cf. *id.,* at 502–508; *Simon* v. *Eastern Ky. Welfare Rights Org.,* 426 U. S. 26, 40–46 (1976).

## II

We noted in *Warth,* and the Court is careful to reiterate today, *ante,* at 112, that the Art. III standing inquiry often is only the first of two inquiries necessary to determine whether a federal court should entertain a claim at the instance of a particular party. The Art. III question is one of power within our constitutional system, as courts may decide only actual cases and controversies between the parties who stand before the court. See *Simon* v. *Eastern Ky. Welfare Rights Org., supra,* at 41–42. Beyond this question, however, lies the further and less easily defined inquiry of whether it is prudent to proceed to decision on particular issues even at the instance of a party whose Art. III standing is clear. This inquiry has taken various forms, including the one presented by this case: whether, in defending against or anticipatorily attacking state action, a party may argue that it contravenes someone else's constitutional rights.[2]

---

[2] The inquiry also has been framed, in appropriate cases, as whether a person with Art. III standing is asserting an interest arguably within the zone of interests intended to be protected by the constitutional or statutory provision on which he relies, see, *e. g., Data Processing Service* v. *Camp,* 397 U. S. 150, 153–156 (1970), or whether a person should be allowed to attack a statute, not on the ground that it is unconstitutional as applied to him, but that it would be unconstitutional as applied to third parties, see, *e. g., United States* v. *Raines,* 362 U. S. 17 (1960); *Dombrowski* v. *Pfister,* 380 U. S. 479, 486–488 (1965); *Broadrick* v. *Oklahoma,*

This second inquiry is a matter of "judicial self-governance." *Warth* v. *Seldin, supra,* at 509. The usual—and wise—stance of the federal courts when policing their own exercise of power in this manner is one of cautious reserve. See generally *Ashwander* v. *TVA,* 297 U. S. 288, 346–348 (1936) (Brandeis, J., concurring). This caution has given rise to the general rule that a party may not defend against or attack governmental action on the ground that it infringes the rights of some third party, *ante,* at 114, and to the corollary that any exception must rest on specific factors outweighing the policies behind the rule itself.[3] See *Barrows* v. *Jack-*

---

413 U. S. 601, 611–618 (1973). Cf. generally *United States* v. *Richardson,* 418 U. S. 166, 196 n. 18 (1974) (POWELL, J., concurring).

[3] I agree with the plurality, *ante,* at 113–114, that a fundamental policy behind the general rule is a salutary desire to avoid unnecessary constitutional adjudication. See *Ashwander* v. *TVA,* 297 U. S., at 346–348 (Brandeis, J., concurring). The plurality perceives a second basis for the rule in the courts' need for effective advocacy. While this concern is relevant, it should receive no more emphasis in this context than in the context of Art. III standing requirements. There the need for effective advocacy or a factual sharpening of issues long was the touchstone of discussion. See *Baker* v. *Carr,* 369 U. S. 186, 204 (1962); *Flast* v. *Cohen,* 392 U. S. 83, 99 (1968). Perhaps a more accurate formulation of the Art. III limitation—one consistent with the concerns underlying the constitutional provision—is that the plaintiff's stake in a controversy must insure that exercise of the court's remedial powers is both necessary and sufficient to give him relief. See *Warth* v. *Seldin,* 422 U. S. 490, 498–499, 508 (1975); *Simon* v. *Eastern Ky. Welfare Rights Org.,* 426 U. S. 26, 38, and n. 16 (1976). The Court today uses this formulation. *Ante,* at 112–113. A similar focus upon the proper judicial role, rather than quality of advocacy, is preferable in the area of prudential limitations upon judicial power. See *Warth* v. *Seldin, supra,* at 498; cf. *Schlesinger* v. *Reservists to Stop the War,* 418 U. S. 208, 225–226 (1974).

Congress by statute may foreclose any inquiry into competing policy considerations and give a party with Art. III standing the

*son,* 346 U. S. 249, 257 (1953); cf. generally *United States* v. *Richardson,* 418 U. S. 166, 188–197 (1974) (POWELL, J., concurring).

The plurality acknowledges this general rule, but identifies "two factual elements"—thought to be derived from prior cases—that justify the adjudication of the asserted third-party rights: (i) obstacles to the assertion by the third party of her own rights, and (ii) the existence of some "relationship" such as the one between physician and patient. In my view these factors do not justify allowing these physicians to assert their patients' rights.

## A

Our prior decisions are enlightening. In *Barrows* v. *Jackson, supra,* a covenantor who breached a racially restrictive covenant by selling to Negroes was permitted to set up the buyers' rights to equal protection in defense against a damages action by the covenantees. See *Shelley* v. *Kraemer,* 334 U. S. 1 (1948). The Court considered the general rule outweighed by "the need to protect [these] fundamental rights" in a situation "in which it would be difficult if not impossible for the persons whose rights are asserted to present their grievance before any court." 346 U. S., at 257. It would indeed have been difficult if not impossible for the rightholders to assert their own rights: the operation of the restrictive covenant and the threat of damages actions for its breach tended to insure they would not come into possession of the land, and there was at the time little chance of a successful suit based on a covenantor's failure to sell to them. In a second case, *NAACP* v. *Alabama,* 357 U. S. 449 (1958), an organization was allowed to resist an order to produce its membership list by asserting the associational rights

right to assert the interests of third parties or even the public interest. See *Warth* v. *Seldin, supra,* at 500–501.

of its members to anonymity because, as the plurality notes, *ante,* at 116, the members themselves would have had to forgo the rights in order to assert them. And in *Eisenstadt* v. *Baird,* 405 U. S. 438 (1972), the Court considered it necessary to relax the rule and permit a distributor of contraceptives to assert the constitutional rights of the recipients because the statutory scheme operating to deny the contraceptives to the recipients appeared to offer them no means of challenge. *Id.,* at 446.

The plurality purports to derive from these cases the principle that a party may assert another's rights if there is "some genuine obstacle" to the third party's own litigation. *Ante,* at 116. But this understates the teaching of those cases: On their facts they indicate that such an assertion is proper, not when there is merely some "obstacle" to the rightholder's own litigation, but when such litigation is in all practicable terms impossible. Thus, in its framing of this principle, the plurality has gone far beyond our major precedents.

Moreover, on the plurality's own statement of this principle and on its own discussion of the facts, the litigation of third-party rights cannot be justified in this case. The plurality virtually concedes, as it must, that the two alleged "obstacles" to the women's assertion of their rights are chimerical. Our docket regularly contains cases in which women, using pseudonyms, challenge statutes that allegedly infringe their right to exercise the abortion decision. Nor is there basis for the "obstacle" of incipient mootness when the plurality itself quotes from the portion of *Roe* v. *Wade,* 410 U. S. 113, 124–125 (1973), that shows no such obstacle exists. In short, in light of experience which we share regularly in reviewing appeals and petitions for certiorari, the "obstacles" identified by the plurality as justifying departure from the general rule

simply are not significant. Rather than being a logical descendant of *Barrows, NAACP,* and *Eisenstadt,* this case is much closer to *Warth* v. *Seldin, supra,* in which taxpayers were refused leave to assert the constitutional rights of low-income persons in part because there was no obstacle to those low-income persons' asserting their own rights in a proper case.[4] See 422 U. S., at 509–510; cf. *McGowan* v. *Maryland,* 366 U. S. 420, 430 (1961).

## B

The plurality places primary reliance on a second element, the existence of a "confidential relationship" between the rightholder and the party seeking to assert her rights.[5] Focusing on the professional relationships

---

[4] The plurality retrospectively analyzes the facts in *Barrows, NAACP,* and *Eisenstadt* in an effort to show that litigation by the rightholders was possible in each case. *Ante,* at 116 n. 6. While this technically may be true, it also is true that the Court in *Barrows* and *NAACP* expressly emphasized the extreme difficulty of such litigation. Moreover, the plurality underestimates the difficulty confronting a would-be Negro vendee in *Barrows* who attempted to prove that race alone blocked his deal with a covenantor. And the plurality denigrates the difficulty of the NAACP members' assertion of their own right to anonymity when in the text on the same page it quotes, approvingly, the very language in the *NAACP* case expressing the difficulty of such litigation. As for *Eisenstadt,* allowing the assertion of third-party rights there was justified not only because of the difficulty of rightholders' litigation, but also because the State directly interdicted a course of conduct that allegedly enjoyed constitutional protection. As explained *infra,* Part II–B, the Court rightly shows special solicitude in that situation.

In any event, as argued above in the text, my basic disagreement with the plurality rests on the facts of *this case,* and the application of the plurality's *own* test—"some genuine obstacle" to the rightholder's assertion of her own rights. There simply is *no* such obstacle here.

[5] The plurality's primary emphasis upon this relationship is in

present in *Griswold, Doe* and *Planned Parenthood of Missouri* v. *Danforth, ante,* p. 52, the plurality suggests that allowing the physicians in this case to assert their patients' rights flows naturally from those three. Indeed, its conclusion is couched in terms of the general appropriateness of allowing physicians to assert the privacy interests of their patients in attacks on "governmental interference with the abortion decision." *Ante,* at 115, 118.

With all respect, I do not read these cases as merging the physician and his patient for constitutional purposes. The principle they support turns not upon the confidential nature of a physician-patient relationship but upon the nature of the State's impact upon that relationship. In each instance the State directly interdicted the normal functioning of the physician-patient relationship by criminalizing certain procedures. In the circumstances of direct interference, I agree that one party to the relationship should be permitted to assert the constitutional rights of the other, for a judicial rule of self-restraint should not preclude an attack on a State's proscription of constitutionally protected activity. See also *Meyer* v. *Nebraska,* 262 U. S. 390 (1923). But Missouri has not directly interfered with the abortion decision—neither the physicians nor their patients are forbidden to engage

---

marked contrast to the Court's previous position that the relationship between litigant and rightholder was subordinate in importance to "the impact of the litigation on the third-party interests." *Eisenstadt* v. *Baird,* 405 U. S. 438, 445 (1972). I suspect the plurality's inversion of the previous order results from the weakness of the argument that this litigation is necessary to protect third-party interests. I would keep the emphasis where it has been before, and would consider the closeness of any "relationship" only as a factor imparting confidence that third-party interests will be represented adequately in a case in which allowing their assertion is justified on other grounds. Cf. n. 2, *supra.*

in the procedure.[6]  The only impact of § 208.152 (12) is that, because of the way Missouri chose to structure its Medicaid payments, it causes these doctors financial detriment.  This affords them Art. III standing because they aver injury in fact, but it does not justify abandonment of the salutary rule against assertion of third-party rights.

## C

The physicians have offered no special reason for allowing them to assert their patients' rights in an attack on this welfare statute, and I can think of none.  Moreover, there are persuasive reasons not to permit them to do so.  It seems wholly inappropriate, as a matter of judicial self-governance, for a court to reach unnecessarily to decide a difficult constitutional issue in a case in which nothing more is at stake than remuneration for professional services.  And second, this case may well set a precedent that will prove difficult to cabin.  No reason immediately comes to mind, after today's holding, why any provider of services should be denied standing to assert his client's or customer's constitutional rights,

---

[6] The plurality contends that assertion of third-party rights has been allowed where "the interference was no more direct than it is here," *ante,* at 118 n. 7, and cites *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925).  *Pierce* is of little or no precedential value since the Court did not address—or even mention—the issue of third-party rights in that case.  More importantly, however, the interference with the normal functioning of the private school-parent relationship was as complete as if it had been proscribed: as the statute required that children be sent " 'to a public school for the period of time a public school shall be held during the current year,' " *id.,* at 530, there was no practical way for parents to send their children to private schools.  As the Court noted, "[t]he inevitable practical result of enforcing the Act . . . would be destruction of appellees' primary schools, and perhaps all other private primary schools for normal children within the State of Oregon." *Id.,* at 534.

if any, in an attack on a welfare statute that excludes from coverage his particular transaction.[7]

Putting it differently, the Court's holding invites litigation by those who perhaps have the least legitimate ground for seeking to assert the rights of third parties.

---

[7] The plurality says it is proceeding "by assessing relevant factors in individual cases . . . , rather than by adopting a set of *per se* rules," and implies that I am advocating the latter course. *Ante,* at 119 n. 7. The fact is that I have not proposed any such set of rules. Rather, my dissent is grounded in the decisions of the Court from which I believe today's holding departs.

By divining from previous cases two factors, and two factors alone, whose application to the facts of this case "quickly yields its proper result," *ante,* at 117, the plurality appears to have articulated a new rule of third-party standing that leaves little room for flexibility. The ease with which the plurality would allow assertion of such standing in this case—based on nothing more substantial than a professional (or perhaps only an abortion-clinic) relationship and dimly perceived "obstacles" to the rightholder's own litigation—suggests that "the proper result" usually will be third-party standing.

The plurality's attempt to distinguish this case from the next one involving another provider of services is not reassuring. Three distinguishing factors are suggested. The first one, a "confidential" relationship, is analytically empty (especially when one recognizes that, realistically, the "confidential" relationship in a case of this kind often is set in an assembly-line type abortion clinic). Moreover, it is unsupported by nearly half of the cases the plurality relies upon in finding "relationship" one of the two elements yielding third-party standing: there was no "confidential" relationship in *Barrows* or *Eisenstadt*—or, so far as the opinion shows, with respect to one of the defendants in *Griswold.* The second suggested distinction is that the woman's right in this case "is one that may be impaired by its assertion." I do not understand how a woman's litigation over her right to make an abortion decision impairs her ability to make that decision. Finally, the plurality falls back on the contention that the woman's claim here is "imminently moot," a point which the plurality's own citation to *Roe* proves to be irrelevant. As these three "distinctions" seem insubstantial, I repeat: Today's holding will be difficult to cabin.

Before today I certainly would not have thought that an interest in being compensated for professional services, without more, would be deemed a sufficiently compelling reason to justify departing from a rule of restraint that well serves society and our judicial system. The Court quite recently stated, with respect to the rule against assertion of third-party rights as well as certain other doctrines of judicial self-restraint, that "[t]hese principles rest on more than the fussiness of judges. They reflect the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws. . . . Constitutional judgments . . . are justified only out of the necessity of adjudicating rights in particular cases between the litigants brought before the Court." *Broadrick* v. *Oklahoma,* 413 U. S., at 610–611 (citation omitted). Today's holding threatens to make just such "roving commissions" of the federal courts.