**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

NESTOR CORDOVA, Administrator of
the Estate of Julieta Cordova,
deceased,

*Plaintiff-Appellant,*

v.

SCOTTSDALE INSURANCE COMPANY,
Erroneously Named as Nationwide
Mutual Insurance Company,

*Defendant-Appellee.*

No. 99-2410

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CA-99-418-A)

Argued: October 31, 2000

Decided: March 1, 2001

Before TRAXLER and KING, Circuit Judges, and
Alexander WILLIAMS, Jr., United States District Judge
for the District of Maryland, sitting by designation.

Vacated and remanded by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Thomas Phillip Mains, Jr., MAINS & MAINS, McLean,
Virginia, for Appellant. Ronald William Fuchs, ECCLESTON &

WOLF, P.C., Washington, D.C., for Appellee. **ON BRIEF:** Matthew W. Lee, ECCLESTON & WOLF, P.C., Washington, D.C., for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

This appeal arises from a direct action initially instituted in state court by Nestor Cordova against Scottsdale Insurance Company ("Scottsdale"), seeking to recover on a $2,000,000 default judgment Cordova had obtained against Dr. Carl Alper, one of Scottsdale's putative insureds. Determining that Alper was not covered under the general and professional liability policy issued by Scottsdale (the "policy"), the district court awarded summary judgment in Scottsdale's favor. Because we are unconvinced that, as a matter of law, Alper was excluded from the policy's coverage, we vacate the district court's judgment and remand for further proceedings.

### I.

### A.

In October 1993, Cordova sued Physicians Clinical Services, a Pennsylvania medical laboratory, as well as John Crawford and Carl Alper, for negligently misreading the pap smear of Cordova's late wife Julieta. In August 1996, Cordova obtained a $2,000,000 final default judgment against Crawford and Alper in the Circuit Court of Fairfax County, Virginia.[1] The case against Physicians Clinical Services was nonsuited.

---

[1]The default judgment against Crawford was vacated in March 1998, on the basis that Virginia's long-arm statute failed to confer jurisdiction over him.

Unable to execute on the default judgment against Alper, Cordova filed a state court direct action against Scottsdale,[2] pursuant to the provisions of Virginia Code § 38.2-2200(2).[3] The action was thereafter removed by Scottsdale to federal court in the Eastern District of Virginia on the basis of diversity of citizenship. Following discovery, both parties moved for summary judgment. Applying Pennsylvania law, the district court determined that Alper was not covered by the policy at the time of his alleged negligence. By its memorandum opinion of September 15, 1999 (the "Memorandum Opinion"), the District Court accordingly granted summary judgment in favor of Scottsdale, which Cordova now appeals. We possess jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

## B.

### 1. *The Entities*

In June 1986, Alper and several colleagues executed a pre-incorporation agreement, evidencing their intent to form a corporation "for the purpose of serving as the general partner of a limited partnership to perform or own or operate one or more medical laboratories." J.A. 41. At that time, Alper subscribed to purchase 30,000 shares of stock in the proposed corporation and was designated as its director, officer, and full-time employee. Pursuant to the pre-incorporation agreement, "Physicians Clinical Services, Ltd." was incorporated in Delaware in July 1986. Thereafter, a partnership by the name "Physi-

---

[2]The named entity in the direct action was initially Nationwide Mutual Insurance Company, doing business as Scottsdale Insurance Company.

[3]Virginia's direct action statute permits litigants bearing unsatisfied judgments to seek recovery directly from the liable party's insurer. The statute provides in relevant part as follows:

> [I]f execution on a judgment against the insured . . . is returned unsatisfied in an action brought to recover damages for [an] injury sustained [then] the action may be maintained against the insurer under the terms of the policy or contract for the amount of the judgment not exceeding the amount of the applicable limit of the coverage under the policy or contract.

Va. Code Ann. § 38.2-2200(2).

cians Clinical Services Limited Partnership" was also formed in Delaware; the partnership agreement identified Physicians Clinical Services, Ltd., as the sole general partner, and an individual, James L. Flore, as the sole limited partner.

Once these legal entities had been created, a medical laboratory doing business under the name "Physicians Clinical Services" commenced operations in Exton, Pennsylvania. Correspondence issued by the laboratory, including the test result reports sent to patients, identified Alper as the "Laboratory Director."

### 2.  *The Policy*

Scottsdale issued the policy in June 1988, and it was renewed effective June 17, 1989. The policy provided "Comprehensive General Liability Insurance" and "Hospital Professional" coverage in the aggregate sum of $6,000,000.[4] It designated "Physicians Clinical Services, Inc." as the named insured.[5]

The policy defines the persons insured as follows:

II.  PERSONS INSURED

Each of the following is an insured under this insurance to the extent set forth below:

(a)   the named insured[;]

(b)   if the named insured is designated in the declarations as a partnership, any partner thereof, but only with respect to that partner's liability as such;

(c)   if the named insured is designated in the declarations

---

[4]This maximum coverage sum represents an underlying $1,000,000 policy (commanding a $35,750 premium), and a rider providing an additional $5,000,000 in coverage (with a premium of $27,750).

[5]Unfortunately, on this record no legal entity by the name "Physicians Clinical Laboratory, Inc." ever existed.

as other than an individual or partnership, any executive officer, hospital administrator, stockholder, or member of the board of directors, trustees or governors of the named insured while acting within the scope of that person's duties as such.

J.A. 92.

Several form endorsements accompanied the policy when it was initially issued, and others were subsequently issued by Scottsdale.[6] On August 16, 1989, a single-page endorsement to the policy was issued by Scottsdale, bearing the caption "Endorsement No. 3" and listing "Physicians Clinical Services, Inc." as the insured. Beyond the identifying information found at the top of the page, Endorsement No. 3 contained the statement: "It is hereby understood and agreed the named insured is a partnership."[7] J.A. 106. Despite this attempt at clarification, inconsistency regarding the insured entity's name (and status) persisted. Scottsdale continued to address its insured as "Physicians Clinical Services, Inc." in certain documents post-dating the issuance of Endorsement No. 3. For example, an endorsement dated August 18, 1989, referred to "Physicians Clinical Services, Inc." as the insured party. J.A. 105. On occasion, Scottsdale referred simply to "Physicians Clinical Services" or "Physicians Limited Partnership" as its insured party — despite the fact that neither was a legal entity.

## II.

We review de novo an award of summary judgment, viewing the facts in the light most favorable to the nonmovant. *Myers v. Finkle*, 950 F.2d 165, 167 (4th Cir. 1991). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

---

[6]It appears that, with one exception, the various endorsements were never executed either by Scottsdale or by the insured. That single exception was Endorsement No. 1 (bearing the caption "Special Condition Endorsement Regarding Subcontractors") which was signed by an authorized agent of Scottsdale, as well as by the laboratory's CFO.

[7]By its terms, Endorsement No. 3 purported to be effective as of June 17, 1989.

is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## III.

### A.

Despite the confusion with respect to the entities referenced as the insured, the issue on appeal is straightforward: Does the policy encompass and insure the acts of Alper, insofar as he was serving as an agent and employee of the "Physicians Clinical Services" medical laboratory?

### 1.

Maintaining that Alper was beyond the scope of coverage, Scottsdale relies on the plain language of Endorsement No. 3, which provided that "[i]t is hereby understood and agreed that the named insured is a partnership." Scottsdale insists that Endorsement No. 3 must be read in conjunction with the policy's "persons insured" clause. Accordingly, Scottsdale concludes that the policy unambiguously designated Physicians Clinical Services Limited Partnership as the named insured, with coverage encompassing Physicians Clinical Services, Ltd., as its sole general partner, under subparagraph (b) of Section II, "but only with respect to that partner's liability as such[.]" In Scottsdale's view, Physicians Clinical Services, Ltd. enjoyed coverage in its capacity as general partner, but such coverage did not trickle down — as would be the case under subparagraph (a) of Section II — to its individual corporate directors, officers or shareholders, including Alper.

In awarding summary judgment, the district court essentially adopted Scottsdale's position, concluding:

> [Endorsement No. 3] was issued two months after the original policy and, importantly, weeks before the negligent reading of Julieta Cordova's lab reports. Moreover, each subsequent endorsement lists the named insured as "Physicians Clinical Services[,]" the trade name of the limited

partnership. Thus, we find that at the time of the alleged negligence in reading the lab report in question, the limited partnership, Physicians Clinical Services, was the named insured. Because Alper was not a partner of that partnership, he is not covered by this policy.

Memorandum Opinion, at 10-11.

2.

 Cordova contends, inter alia, that the district court's interpretation of the policy does not comport with the "reasonable expectations of the insured." Indeed, under Pennsylvania law,[8] courts are instructed

[8]Neither party to this appeal quarrels with the district court's decision to treat Pennsylvania law as that governing the policy. *See* Memorandum Opinion, at 8 ("[B]ecause the general partner which arranged for the insurance contract was located in Pennsylvania and the insurance contract was delivered to Pennsylvania, we find that Pennsylvania law should cover the interpretation of the insurance policy at issue."). We also accept the district court's decision to apply Pennsylvania's substantive law.

Scottsdale, however, summarily contends on appeal that the Virginia direct action statute, *see supra* note 2, is not applicable to Cordova's suit, since that statute "expressly limits its application to policies 'issued and delivered in this Commonwealth.'" Appellee's Br. at 20. If Pennsylvania's direct action counterpart were instead applied, Scottsdale contends, it would be incumbent upon Cordova "to allege and present admissible evidence demonstrating that his collection efforts against Alper were unsuccessful *due to Dr. Alper's insolvency or bankruptcy*." *Id.* at 23 (emphasis added). Cordova failed to so allege and establish; accordingly, Scottsdale insists, Cordova lacked standing to bring this direct action. In his Reply Brief, Cordova asserts that Scottsdale waived this defense "[b]y contending in its summary judgment motion that the sole issue before the court involved the question of coverage for Alper[.]" Appellant's Reply Br. at 8. Moreover, as Cordova observes, this issue was neither addressed nor decided by the district court. *Id.*

While Scottsdale characterizes this issue as one of "standing," it relates solely to the adequacy of Cordova's pleadings. As such, we will decline to consider the issue, since it was neither addressed by the district court

to consider the reasonable expectations of the insured in determining coverage issues — and even, on occasion, to give precedence to such expectations over the express language of a policy. *See Bensalem Township v. Int'l Surplus Lines Ins. Co.*, 38 F.3d 1303, 1311 (3d Cir. 1994). Cordova challenges a result by which Scottsdale would effectively reduce the scope of its coverage without either obtaining the insured's direct consent, i.e., a written acknowledgment of Endorsement No. 3, or reducing the premium commensurately.

In its Memorandum Opinion awarding summary judgment to Scottsdale, the district court did not address the "reasonable expectations of the insured." Instead, it determined that the policy initially covered the officers, directors, and administrators of Physicians Clinical Services, Ltd.:

> We are satisfied that there is no material difference between "inc" and "ltd" and that on this record until August 16, 1989, the policy covered Physicians Clinical Services, Ltd.

Memorandum Opinion, at 9. The district court, however, then proceeded to conclude that the issuance of Endorsement No. 3 had the effect of immediately terminating the corporation's coverage. At that time, "it became unambiguously clear that the parties to the contract intended that the partnership, Physicians Clinical Services, was the named insured and not the corporation, Physicians Clinical Services, Ltd." *Id.* As further evidence of the parties' intentions, the district court observed that all subsequent endorsements "list[ed] the named insured as 'Physicians Clinical Services', the trade name of the limited partnership." *Id.* at 10.

---

nor fully briefed by the parties. *Cf. Singleton v. Wulff*, 428 U.S. 106, 121 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals[.]"). Upon remand, the district court may, if it deems it appropriate, determine whether Scottsdale has waived this defense and, if not, evaluate its merits in the first instance.

B.

1.

Although the plain terms of Endorsement No. 3 cannot be ignored, we must reject the district court's conclusion that this endorsement validly and unambiguously amended the policy. Under Pennsylvania law, if the provisions of an insurance policy are clear and unambiguous, they are to be given their plain and ordinary meaning. *Riccio v. Am. Republic Ins. Co.*, 705 A.2d 422, 426 (Pa. 1997). If, instead, the policy's provisions are ambiguous, they must be construed in favor of the insured and against the insurer as the drafter of the instrument. *Id.* In determining ambiguity, a court must read the policy in its entirety and ascertain its intent from consideration of the entire instrument. *Id.*

Where, as appears to be the situation here, an amendatory endorsement has been issued containing terms which conflict with those in the main policy, the endorsement's terms prevail. *See St. Paul Fire & Marine Ins. Co. v. United States Fire Ins. Co.*, 655 F.2d 521, 524 (3d Cir. 1981). In particular, an endorsement that expands the scope of coverage will be regarded by Pennsylvania courts as trumping more restrictive coverage terms contemplated by its underlying form policy. *See id.* On the other hand, an insurer cannot *reduce* the scope of coverage merely by issuing an amendatory endorsement. Of importance, Pennsylvania law instructs that insurance policies, like other contracts, cannot be changed or modified without the consent of both parties. *See, e.g., J.M.P.H. Wetherell v. Sentry Reinsurance, Inc.*, 743 F. Supp. 1157, 1170 (E.D. Pa. 1990) (noting that an insurer "may not modify the terms of a contract by issuing a certificate which conflicts with the terms of the agreed upon contract"); *Murray v. John Hancock Mut. Life Ins. Co.*, 69 A.2d 182, 183 (Pa. Super. Ct. 1949) ("[O]rdinarily, a contract of insurance cannot be changed without the consent of both parties."); *see also* 4 Eric Mills Holmes, *Holmes' Appleman on Insurance 2d*, § 20.1 at 157-58 ("Almost any change of the policy may be made by endorsement with consent. . . . [N]o consideration is required where the endorsement is attached *before* the policy is delivered.") (emphasis added).

2.

In order to evaluate the validity and effect of Endorsement No. 3 — which, Scottsdale implicitly concedes, was issued separately from the policy — we must first identify the insured party when the policy was issued. As we have observed, the district court construed the policy's references to "Physicians Clinical Services, Inc." to warrant the conclusion that the original insured was the corporation, Physicians Clinical Services, Ltd. *See* Memorandum Opinion, at 9. While the district court's inference was not entirely unreasonable, we are not satisfied, as a matter of law, that Physicians Clinical Services, Ltd. was the intended insured.

Scottsdale's use of "Inc." in references to the insured entity certainly implies an understanding that the entity enjoyed corporate status; the fact that the policy denominated the insured as a corporate entity cannot, however, support a legal conclusion that Physicians Clinical Services, Ltd. was the actual insured. By its terms, the policy was by no means clear and unambiguous as to the insured's identity. In the absence of other compelling evidence evincing the parties' intent, we must conclude that a factual question remains as to the identity of the insured at the time the policy was issued.

3.

Just as the policy, when initially issued, did not denominate the insured entity clearly and unambiguously, the factual record available to us also does not clearly establish the intended effect of Endorsement No. 3. That is, it is not apparent whether this endorsement was intended to memorialize the parties' understanding of the policy as issued, or was instead intended to materially alter the terms of the policy's coverage.

Under these circumstances we also must conclude that genuine issues of material fact remain as to the identity of the named insured at the time of the endorsement's issuance. If, as the district court determined, the corporation (Physicians Clinical Services, Ltd.) was the original named insured, then Endorsement No. 3 would have the effect of modifying, indeed diminishing, the scope of coverage. Corporate directors, officers, and stockholders (including Alper) who

were initially insured, under subparagraph (c) of Section II of the policy, would be stripped of coverage by Endorsement No. 3 — despite the fact that neither the insured's written consent had been obtained nor the premium reduced to reflect the diminished coverage. Such a result would do violence to the fundamental principle that a contract cannot be modified without the consent of both parties. *See J.M.P.H. Wetherell*, 743 F. Supp. at 1170.

The evidence produced by Scottsdale in support of its motion for summary judgment fails to establish that it obtained valid consent and agreement to the issuance of Endorsement No. 3. Without such consent, this endorsement, which would give rise to coverage of a partnership under subparagraph (b) of Section II of the policy, cannot be given legal effect. In sum, because factual issues exist as to the identity and nature of the insured, and also as to the validity of Endorsement No. 3, Alper's coverage under the policy cannot be denied as a matter of law.

### IV.

For these reasons, we vacate the district court's award of summary judgment to Scottsdale and remand for further proceedings.

*VACATED AND REMANDED*