610 F.2d 456
 MAHONING WOMEN'S CENTER, Plaintiff-Appellee, Cross-Appellant,
v.
Jack C. HUNTER, Mayor and President of the Board of Health;
Donald Baker, Chief of Police; Richard Hughey, Herman "Pete"
Starks, Patrick J. Ungaro, Robert G. Spencer, Leonard J.
Yurcho, Michael J. Crogan, and John T. Murphy, City Council
Members; Dr. Samuel Goldberg, Douglas K. Everett, Warren
Harrell, Jr., Mrs. Doris Rinkov, and Mrs. Joyce Kester,
Board of Health Members, Defendants- Appellants, Cross-Appellee.
 Nos. 77-3406, 77-3524.
 United States Court of Appeals,
Sixth Circuit.
 Argued April 18, 1979.
Decided Dec. 18, 1979.
 
 Leonard D. Schiavone, Law Dept., William J. Higgins, Youngstown, Ohio, for defendants-appellants.
 Robert Destro, Thomas Keenan, Joseph Meissner, Lawyers for Life, Cleveland, Ohio, for amicus "Lawyers for Life".
 Dennis Haines, Green, Schiavoni, Murphy & Haines, Patricia S. Roberts, Youngstown, Ohio, for plaintiff-appellee.
 Robert P. App, ACLU of Ohio Foundation, Inc., Columbus, Ohio, Robert Destro, Cleveland, Ohio, for amicus ACLU.
 Before ENGEL and MERRITT, Circuit Judges, and PHILLIPS, Senior Circuit Judge.
 MERRITT, Circuit Judge.
 
 
 1
 In Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court held under the due process clause that a woman's right to choose an abortion is a protected liberty sufficiently important that a legislative majority may not prohibit it entirely or burden it significantly during the first trimester. The Youngstown city ordinance in question here, as District Judge Lambros concluded,[1] so undermines the effective enjoyment of the rights guaranteed in Wade as to render the ordinance invalid. The ordinance imposes a series of costly medical and building code regulations on abortion clinics performing first trimester abortions.
 
 I.
 
 2
 Shortly after Mahoning Women's Center, Inc. leased space in Youngstown, Ohio, for use as a first-trimester abortion clinic, the city council enacted Chapter 98.00 of its Revised Code of Ordinances, entitled "ABORTIONS." Among the multitude of medical and surgical techniques and operations in existence, Youngstown has singled out for extensive regulation only medical clinics performing abortions. It requires abortions after the first trimester to be performed in a hospital licensed as a maternity unit by the Department of Health of the State of Ohio. Its other provisions apply to All abortions (i. e., first-trimester abortions) not performed in a hospital regulated by the Department of Health of the State of Ohio, including individual physicians' offices. They prohibit operation of a non-hospital abortion service without a license issued by the Board of Health of the City of Youngstown.
 
 
 3
 The ordinance recites that its single purpose is to require "the highest standards of health care . . . for the protection of the pregnant woman." To that end, the ordinance regulates the location and physical conditions of abortion clinics, qualifications of its staff, the types of services and equipment required, and the procedures to be followed. Some of the requirements do little more than ensure sanitation, orderliness, and the privacy and comfort of patients. Others, taken together, effectively require that all first-trimester abortions be performed in facilities that are the functional equivalent of a hospital. Abortion operations must be supervised by a "diplomate of the American Board of Obstetrics and Gynecology," a "professor of medicine" or other highly qualified "obstetrician," and only obstetricians or surgeons may perform the abortions. Anesthesia may only be administered by an anesthesiologist. Nursing personnel must be supervised and directed by a registered nurse with post-graduate education or experience in obstetric or gynecological nursing. The clinic must have expensive and elaborate equipment: a cardiac defibrillator; an X-ray machine; knee or foot controlled sinks; a clinical laboratory equipped to perform a broad spectrum of required tests; a standard operating room or a written agreement with a hospital located within a total transport time of fifteen minutes for use of a standard operating room.
 
 
 4
 Other provisions require the pregnant woman's written, informed consent before an abortion can be performed, and establish extensive recordkeeping requirements without insuring confidentiality, including "admission and discharge notes, histories, results of tests and other progress notes of patients," as well as "written verification by one or more physicians of the diagnosis and duration of pregnancy." Finally, the ordinance requires that each abortion service be licensed and provides for evaluation of the facility seeking licensure by the Board of Health with the assistance of a panel of qualified obstetricians or gynecologists appointed by the Board. Violation of any of its provisions is punishable by fine and imprisonment.
 
 
 5
 Mahoning Women's Center, Inc. applied for and was denied a license for its facilities. The Center then filed this suit for alleged violations of 42 U.S.C. § 1983 against various city officials and members of the city council, individually and in their official capacities, seeking declaratory and injunctive relief and damages. Plaintiff alleged Chapter 98.00 was violative of constitutional rights of due process and equal protection, and of the fundamental right of women to decide whether to bear a child.[2]
 
 
 6
 At the trial, the parties presented conflicting testimony of medical experts. The focus of the disagreement among the medical experts was the need for equipment necessary for dealing with major surgical complications. The doctors were in accord, however, as to the need for direct surgical supervision by an obstetrician. The District Court found that Chapter 98.00 "effectively requires any abortion service to be equipped and staffed in such a fashion as to provide facilities equivalent to those of hospital surgical wards." The Court further found that, in order for the Center to comply with the ordinance, it must pay for additional equipment and increased salaries. The Center's present fee for services was $175.00, but hospital fees for the same services ranged between $300.00 and $500.00. One medical expert testified that, in his opinion, compliance with the requirements of the ordinance would require the Center to double or triple its fee. The Court found that the surgical procedures utilized by the Center in performing first-trimester abortions were of a minor nature and involved a low percentage of complications. Finally, the District Court found that no hospital in the Youngstown area performed abortions for other than therapeutic purposes.
 
 
 7
 The District Court concluded that the ordinance disregarded a woman's fundamental right to seek an abortion and the constitutional standards set forth in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The Court also concluded that it denied equal protection of the law to those physicians who would perform abortions in that the ordinance regulated only those physicians while leaving other comparable medical procedures to the discretion of the attending physician. The District Court declined to sever the constitutional from the unconstitutional provisions of the ordinance and declared it unconstitutional in its entirety.
 
 II.
 
 8
 We recognize and affirm the value our society accords the life of the unborn child. But for two reasons it is not open to us in this case involving first-trimester abortions to weigh the state's interest in preserving the unborn embryo against the mother's right to decide not to bear a child. First, the Supreme Court, after weighing these interests, has spoken on this issue, holding that the mother's choice during the first trimester is the determining factor. Second, the interest of the unborn embryo is not before us here because the ordinance in question, according to its express terms, is concerned solely with insuring the "highest standards of health care" for the mother. The conflict in question then is solely between the city's interest in the health of the mother and the mother's right to control her reproductive system during the first trimester of pregnancy.
 
 
 9
 The subject of abortion is now heavily entangled in a public controversy about the right to life of the unborn fetus. This controversy arises from differing views about religion, woman's liberation, social morality, and appropriate lifestyles. In reviewing the ordinance in question here, we put those controversies entirely to one side and look to the holdings and purposes stated in Supreme Court opinions concerning a woman's control over her own reproductive system during the first trimester.
 
 III.
 
 10
 In addition to formulating specific limitations on government in the first eight amendments of the Constitution, the founding fathers in a more general way carved out a slice of human affairs of a private nature which should be "retained by the people" without legislative interference. The ninth amendment provides that "(t)he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." Under the fourteenth amendment, the federal courts are required to identify and enforce those personal rights which may not be abridged by local legislative majorities. Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), identified one of those rights. It is a "part of a series of decisions allocating to the woman the essentially unfettered choice of whether to bear a child"[3] based on her own needs and moral sense, instead of leaving the choice to legislative majorities, parents or spouses.
 
 
 11
 Depending on local sentiment, legislative majorities differ on the subject of reproduction. Many have enacted measures requiring birth and prohibiting abortion and a few have required sterilization or otherwise penalized childbirth. The Supreme Court has consistently held that any significant restraint either way on the woman's autonomy is invalid. This general principle has prevailed no matter whether the current legislative majority favors or opposes contraception,[4] sterilization,[5] abortion,[6] delegation of control of the abortion decision to the parents or spouse of the pregnant woman,[7] or measures that penalize the pregnant woman for deciding to bear a child.[8]
 
 
 12
 Having previously declared the woman's unfettered right to choose to carry the child to term or (with the advice of her doctor) to terminate pregnancy during the first trimester, the Supreme Court in Planned Parenthood v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) struck down a law which interfered with the effective enjoyment of that right. One of the laws invalidated in Danforth required that the abortion procedure employ a particular, medical technique (prostaglandin rather than saline amniocentesis) that, Although preferable from a medical perspective, was not widely available. The same principle of effective enjoyment applies here.
 
 
 13
 The Youngstown ordinance likewise is designed to leave in place in an abstract sense the woman's autonomy and choice, her abstract "right" to get an abortion during the first trimester, but the ordinance removes the effective enjoyment of that right by imposing heavy and unnecessary conditions on the performance of the operation. The Supreme Court found in Wade on the basis of medical evidence that first-trimester abortions are relatively simple, uncomplicated operations, as safe or safer than normal childbirth. 410 U.S. at 149, 93 S.Ct. 705. Yet the Youngstown ordinance disqualifies an operation supervised by a general practitioner with years of education and practical experience. It even disqualifies an operation supervised by a skilled surgeon who is not an obstetrician. The city may not define the term "physician" to mean more than "a physician currently licensed by the State." Id. at 165, 93 S.Ct. at 732. The regulation of first-trimester abortions is constitutionally suspect. The city has not suggested a compelling reason for singling out and imposing such onerous performance restrictions on this particular surgical procedure.
 
 
 14
 Neither is there a compelling need for the expensive equipment required by the ordinance. A cardiac defibrillator starts the heart going again if it should stop. The city does not require such a machine for other much more complicated operations, and again we see no reason why abortions should be singled out. The city does not require an X-ray machine or a standard operating room at the place where a doctor sets a broken leg or shoulder. It does not require special foot controlled sinks at a place where a doctor amputates an arm. It does not require a clinical laboratory at a place where blood transfusions are given or hormone, insulin or other chemical injections are administered. Only at places performing first-trimester abortions are these conditions imposed.
 
 
 15
 This ordinance is more subtle than one that requires that all marriages take place in a building with a steeple or that all sexual relations take place in a room wired to detect the use of contraceptive devices. But the ordinance, by imposing costly and unnecessary restrictions, is designed to burden and deny in a similar way the effective enjoyment of a choice reserved to the individual by the Constitution. Its enforcement will return us to the days of illegal back street abortion mills for the poor. Only the middle class and the well-to-do would be able to afford the operation.
 
 
 16
 Like the District Court, we cannot untangle the constitutional from the unconstitutional provisions of such an ordinance. Its main provisions and purpose are clearly invalid. Although the informed consent provisions may be valid in other contexts,[9] the consent required here necessarily incorporates the woman's consent to performance of the operation according to the other unconstitutionally imposed conditions of the ordinance. Recordkeeping provisions may be valid in other contexts,[10] but this ordinance imposes unconstitutional qualifications and controls on the medical people who are supposed to create, maintain and use the records. In this situation, we do not believe a useful purpose would be served by attempting to rewrite the minor provisions of the ordinance in order to make them constitutional.[11]
 
 
 17
 Accordingly, the judgment of the District Court is affirmed.
 
 
 
 [1]
 See Mahoning Women's Center v. Hunter, 444 F.Supp. 12 (N.D.Ohio 1977)
 
 
 [2]
 Jurisdiction is premised on 28 U.S.C. § 1331. Plaintiff's financial interest assures its standing to attack the constitutionality of the ordinance. Singleton v. Wulff, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). Additionally, plaintiff demonstrates sufficient stake in the outcome to assert the rights of its patients. See Friendship Med. Center, Ltd. v. Chicago Bd. of Health, 505 F.2d 1141 (7th Cir. 1974), Cert. denied sub nom. Chicago Bd. of Health v. Friendship Med. Center, Ltd., 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975); Mobile Women's Med. Clinic v. Board of Comm'rs, 426 F.Supp. 331 (S.D.Ala.1977). See also Doe v. Bolton, 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). We express no view as to the constitutionality of the ordinance as applied to individual medical doctors
 
 
 [3]
 Tribe, American Constitutional Law 933 (1978)
 
 
 [4]
 Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (invalidating state prohibition of use of contraceptives by married persons)
 
 
 [5]
 Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (invalidating state sterilization of convicts)
 
 
 [6]
 Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)
 
 
 [7]
 Planned Parenthood v. Danforth, 428 U.S. 52, 67-75, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973)
 
 
 [8]
 Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) (invalidating state restrictions on work by pregnant teachers who decide to have child)
 
 
 [9]
 Planned Parenthood v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976)
 
 
 [10]
 Ibid
 
 
 [11]
 In declining to award attorneys fees to plaintiff, the District Court did not abuse the "discretion" expressly vested in it by 42 U.S.C. § 1988 (1976). In ruling upon requests for the award of attorneys fees, the District Court may consider the nature of the question presented, the good faith of the parties, the means of the plaintiff and the quality and extent of the legal services rendered. Weighing these considerations, the Court decided not to make an award of attorneys fees. Plaintiffs do not offer any persuasive reasons for finding that the District Court abused its discretion in this regard