In re **PAYLESS CASHWAYS, INC., d/b/a Payless Cashways, d/b/a Furrow, d/b/a Lumberjack, d/b/a Hugh M. Woods, d/b/a Somerville Lumber, d/b/a Knox Lumber, Debtor.**

**Amtech Lighting Services Company, Creditor–Appellant,**

v.

**Payless Cashways, Debtor–Appellee.**

**International Association of Lighting Management Companies, Amicus on Behalf of Appellant.**

**BAP Nos. 98–6044WM, 98–6075WM.**

United States Bankruptcy Appellate Panel of the Eighth Circuit.

Submitted Dec. 10, 1998.

Decided Feb. 10, 1999.

Paul M. Hoffmann, Kansas City, MO, for appellant.

Mark H. Ralston, Dallas, TX, Karin B. Torgerson, Dallas, TX, on the brief, for amicus curiae.

Benjamin F. Mann, Kansas City, MO, Michelle M. Boehm, Kathryn B. Bussing, Kansas City, MO, on the briefs, for appellee.

Before: HILL, WILLIAM A., DREHER and EDMONDS,[1] Bankruptcy Judges.

DREHER, Bankruptcy Judge.

These appeals are from two orders of the bankruptcy court.[2] The first order, dated May 7, 1998, sustained an objection by Debtor, Payless Cashways, Inc. (Payless), to Claim Number 5116 filed by Amtech Lighting Services Company (Amtech). The second, dated July 17, 1998, denied Amtech's motion for reconsideration. The effect of the bankruptcy court's orders was to allow Amtech an unsecured claim in the sum of $1,733,449.84, but to deny Amtech secured status on that claim. We affirm.

## FACTS AND PROCEDURAL HISTORY

### A. THE AGREEMENT

Payless was engaged in the retail sales business. Before it filed for bankruptcy it was doing business in at least twenty states. Amtech designs, builds, and maintains internal and external lighting systems for businesses.

This dispute arises out of an Agreement dated April 1, 1995, between Payless and Amtech (the Agreement). Under the Agreement, entitled "Lighting Retrofit and Maintenance Agreement," Amtech agreed to retrofit or relamp ceiling-mounted lighting fixtures at 164 Payless locations in twenty states. These services were identified as "Initial Services." Amtech was also to provide continuing maintenance services, which included inspecting all locations for burned out bulbs and replacing inoperative lights, ballasts, lamp holders, and wiring on a regular and on an emergency basis. These services were identified as "Continuing Services."

Payless did not pay cash for the initial installation, and it did not borrow money from others to do so. Instead, the parties agreed to a credit arrangement whereby the cost of the retrofitting and relamping would be amortized over a forty-eight month period. These costs were spread out to each of the 164 Payless locations. In addition, for each location, Payless would pay a monthly charge for the continuing maintenance services, as well as extra charges for replacement lightbulbs, lamps, and supplies. Under Paragraph 6 of the Agreement, Payless had the right to terminate the contract without cause as to any or all stores on sixty days' notice. Under Paragraph 7, either party

---

1. The Honorable William L. Edmonds, Chief Judge, Northern District of Iowa, sitting by designation.

2. The Honorable Arthur B. Federman, United States Bankruptcy Judge, Western District of Missouri.

could terminate the Agreement for cause on thirty days' notice. Paragraph 8 allowed each party to terminate the contract in the case of bankruptcy, insolvency, or similar financial event of the other. Paragraph 5 provided:

5. If Customer [Payless] terminates the Agreement pursuant to Paragraphs 6, 7, or 8 then Customer [Payless] shall pay to the Contractor [Amtech] an amount equal to 100% of unaccrued Initial Services for the number of months remaining on the Agreement for each Store that has received an Initial lighting retrofit and that is being serviced under the Agreement at the effective date of the notice. This is not a penalty, but represents initial costs, overheads, and profits for work completed by Contractor in providing labor and materials for Initial lighting retrofit. If Customer terminates the continuing service portion of this agreement pursuant to the provisions of PARAGRAPH 7 ONLY (Breach of agreement or default by Amtech Lighting Services), it is agreed that the unaccrued initial services may still, at the customer's option, be amortized over the term of the agreement under the established terms and conditions.

There was conflicting evidence regarding whether the Initial Services and the Continuing Services portions of the contract were segregable. A Payless witness testified that Payless's obligation to pay for the original installation and its obligation to pay for the continuing maintenance services were segregable, and Payless could cancel the continuing maintenance portion at any time. Amtech's witness testified that he viewed the continuing maintenance services as an integral part of the overall contract. He pointed, particularly, to his view that the energy savings the Agreement was designed to generate could be diminished if the wrong replacement light bulbs were installed after the original installation. He opined that he doubted Payless would have canceled because of the practical difficulties of bringing in a new maintenance contractor.

Amtech completed all initial installation work at all locations over a period of approximately twelve months. The bankruptcy court found, and the parties agree, that Amtech completed the initial installations in Minnesota on August 29, 1995; Nevada on December 20, 1995; Oklahoma on February 9, 1996; and, Texas on April 8, 1996. Amtech also provided routine maintenance and repair services at all 164 locations. For a while, things went smoothly. Amtech finished the initial installation work at all locations, and Payless paid both the monthly amortized per-location installation charge and the monthly service charge for the continuing maintenance services at each such location. In addition, while not specifically covered by the Agreement, from time to time Payless would request and Amtech would perform additional upgrade work, such as installing an additional outdoor parking light or replacing a lighting pole knocked down accidentally.

The monthly charges for the continuing maintenance and for any additional installation work ordered after completion of the original installation were billed and paid for promptly; they are not part of these appeals. It is the amount still due and owing for the Initial Services at the time of the bankruptcy filing that is in contention. At the date Payless filed for bankruptcy relief, Amtech had taken no steps to perfect a mechanics' lien in any of the several states. By failing to do so it exposed itself to the argument that Payless makes in these appeals, i.e., that Amtech is not entitled to mechanics' liens for the unpaid amount for the initial installation work because it failed to timely perfect.

B. THE PAYLESS BANKRUPTCY

On July 21, 1997. Payless filed for relief under Chapter 11 of the Bankruptcy Code. On September 27, 1997. Payless advised Amtech that, pursuant to 11 U.S.C. § 365, it would reject the contract effective October 1, 1997. On October 13, 1997, Amtech filed Claim Number 5116 for $1.733.449.84, which represents the remaining amount due for the initial installation work done at locations in four of the twenty states covered by the Agreement: Minnesota ($214.883.39). Oklahoma ($197,914.24), Nevada ($158,450.00), and Texas ($1,162,201.45). Amtech's claim asserted that it was secured, and in subse-

quent briefing it asserted that it was entitled to statutory mechanics' liens in those four states covering the unpaid amounts. While Payless still owed Amtech for a portion of the initial installation in sixteen other states, Amtech did not claim mechanics' liens in any of those sixteen states. Amtech also filed an unsecured claim for all amounts due for the initial installation in all twenty states, noting that Claim Number 5116 was not to be considered duplicative, but was designed to preserve Amtech's claim to a mechanics' lien in at least these four states.

On November 19, 1997, the bankruptcy court confirmed a Plan of Reorganization, which is expected to pay unsecured creditors pennies on the dollar. Between November 24, 1997, and December 18, 1997. Amtech took steps to perfect mechanics' liens for sixty-one stores located in Minnesota, Oklahoma, Nevada, and Texas. While Payless agrees that Amtech has an allowable unsecured claim for all amounts still owed for the initial installation work for all stores in all states, it has objected to the secured status of such a claim.

## C. The Bankruptcy Court Decision and the First Appeal

Following an evidentiary hearing, the bankruptcy court rejected Amtech's claim to mechanics' lien rights. The court held that, on its face, the contract was divisible into two parts, one consisting of initial design and installation work (Initial Services) and one consisting of ordinary maintenance and repair services (Continuing Services). It noted that the initial installation work by far represented the greater percentage of each monthly bill for each location.[3] The court held, in essence, that the Agreement had two components: 1) installation of a new lighting system, the charges for which were payable over forty-eight months, unless, under Paragraph 5, they became immediately due and payable by reason of termination of the Agreement, and 2) ordinary maintenance and repair, the charges for which were billed on a monthly basis.

The bankruptcy court separately analyzed the law in Minnesota, Oklahoma, Nevada, and Texas. Because it was undisputed that all initial installation was completed in late 1995 and early 1996, the bankruptcy court held that, in all four states, the time to perfect had long since passed. The bankruptcy court also rejected Amtech's argument that, because Payless was promptly paying each month, Amtech would have risked a suit for slander of title if it had attempted to perfect a mechanics' lien earlier. The court noted that parties cannot extend by contract the statutory time limit to perfect a mechanics' lien and that Amtech could have protected itself by treating the transaction for what it was, a loan, and taken steps to perfect a security interest in the various states.

## D. The Motion to Reconsider, the Second Order, and The Second Appeal

On July 2, 1998, while Amtech's appeal from the order of May 8, 1998, was pending, Amtech filed a motion to reconsider the claim pursuant to 11 U.S.C. § 502(j). Amtech urged that, while preparing to appeal from the initial order, it hired Texas counsel who advised for the first time that the Texas Constitution provided Amtech a new alternative basis for asserting a lien.

The bankruptcy court denied Amtech's motion. It held that Amtech had not shown that its neglect in failing to argue and prove this point at an earlier stage during the evidentiary hearing was excusable. Specifically, the court held that reconsidering the order posed a danger of prejudice to Payless and would substantially impact judicial economy because the court had already heard the evidence and decided the matter once. Although the court found that Amtech acted in good faith, it determined that the reason for delay in asserting the constitutional lien theory was its failure to retain knowledgeable counsel in the first place. On balance, the court found that these factors did not support a finding of excusable neglect. The court also held that establishing a constitu-

---

3. For example, at one store in Texas, the monthly contract amount was $919.02, $836.82 of which represented the amortized payment amount for the initial installation and $82.20 of which represented the monthly maintenance fee.

tional lien would require holding a further evidentiary hearing, at the conclusion of which Amtech was unlikely to prevail on the merits in any significant amount. Amtech then filed the second appeal we address in this decision.

## APPEAL FROM THE MAY 8, 1998, ORDER

### A. STANDARD OF REVIEW

■ We review findings of fact for clear error, while conclusions of law are subject to de novo review. *Forbes v. Forbes (In re Forbes)*, 215 B.R. 183, 186–87 (8th Cir. BAP 1997) (citing *O'Neal v. Southwest Missouri Bank (In re Broadview Lumber Co.)*, 118 F.3d 1246, 1250 (8th Cir.1997); *Hartford Cas. Ins. v. Food Barn Stores. Inc. (In re Food Barn Stores, Inc.)*, 214 B.R. 197, 199 (8th Cir. BAP 1997)). "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *Forbes,* 215 B.R. at 187 (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). "If the bankruptcy court's account of the evidence is plausible in light of the entire record viewed, it must be upheld even though we may have weighed the evidence differently had we been sitting as the trier of fact." *Id.* (citing *Anderson,* 470 U.S. at 573–74, 105 S.Ct. 1504).

■ A key question in the appeal from the May 8, 1998, order is whether the Agreement is entire or divisible, that is, whether the parties intended one overall continuous contract. The bankruptcy court held that the parties intended two separate agreements. In all four states involved, a trial court's determination of whether a construction contract is divisible is a question of fact reviewed for clear error. *Geo, Sedgwick Heating & Air Conditioning Co. v. Riverwood Cos.,* 409 N.W.2d 289, 290 (Minn.Ct.App.1987); *Cushing Country Club v. Boardman Co.,* 381 P.2d 856, 858 (Okla.1963); *Fessman v. Barnes,* 108 S.W. 170, 171 (Tex.Civ.App.1908); *Tonopah Lumber Co. v. Nevada Amusement Co.,* 30 Nev. 445, 97 P. 636, 638 (1908).

### B. GENERAL PRINCIPLES

■ As a general rule, a mechanics' lien is the creation of statute, not of the common law. *Fisher Bros. v. Harrah Realty Co.,* 92 Nev. 65, 545 P.2d 203, 204 (1976); *Dunham Assocs. v. Group Investments, Inc.,* 301 Minn. 108, 223 N.W.2d 376, 383 (1974); *Wood v. Barnes,* 420 S.W.2d 425, 428 (Tex.Civ. App.—Dallas 1967); *American Tank & Equip. Co. v. T.E. Wiggins, Inc.,* 170 Okla. 504, 42 P.2d 115, 117 (1934). A party asserting such a lien bears the burden of establishing both that a lien attached and that such party has substantially complied with the requirements for perfection. As a general rule, courts take a strict view of whether a lien has attached. *Davidson Oil Country Supply Co. v. Pioneer Oil & Gas Equip. Co.,* 689 P.2d 1279, 1280–81 (Okla.1984); *Dolder v. Griffin,* 323 N.W.2d 773, 780 (Minn.1982); *Royal Indemnity Co. v. American District Steam Co.,* 88 S.W.2d 1091, 1093 (Tex.Civ. App.—Austin 1935); *Tonopah Lumber Co. v. Nevada Amusement Co.,* 30 Nev. 445, 97 P. 636, 639 (1908). However, they are more liberal in construing the statute after attachment and, thus, only require substantial compliance for perfection. *Davidson Oil,* 689 P.2d at 1280–81; *First Nat'l Bank v. Sledge,* 653 S.W.2d 283, 285 (Tex.1983); *Armco Steel Corp. v. Chicago & North Western Ry. Co.,* 276 Minn. 133, 149 N.W.2d 23, 26 (1967); *Tonopah,* 97 P. at 639. In other words, while all states recognize the importance of liberal construction of the mechanics' lien laws so as to protect artisans who perform services or supply materials that enhance the value of realty, none of the four states takes such a liberal construction to the point of ignoring the statutory language.

■ It is further well accepted that parties may not by contract alter the statutory requirements with respect to the type of work that is lienable or the appropriate steps that must be taken to perfect. Because, until perfected, these liens are secret and work to the disadvantage of other creditors, a party claiming such a lien must meet the statutorily set criteria for attachment and perfection, regardless of whether the parties have agreed upon different terms. *See Industrial Structure & Fabrication, Inc. v. Arrowhead*

*Industrial Water, Inc.*, 888 S.W.2d 840, 844 (Tex.App.1994); *Shawver & Son, Inc. v. Tefertiller (In re Tefertiller )*, 772 P.2d 396, 399 (Okla.1989); *Dolder*, 323 N.W.2d at 780; *Fisher Bros.*, 545 P.2d at 204–05.

██ At times the question arises as to whether a series of activities is to be considered a continuing contract for purposes of determining whether a lien has been timely perfected. This commonly occurs when a contractor fails to timely perfect at the conclusion of initial construction work, performs additional work, and then perfects. Under the theory of "continuing contract," if work is performed over a period of time, or in a series of steps, and the parties intend one continuous contract, the time for filing or perfecting such a lien does not commence until conclusion of the last step. *Kahle v. McClary*, 255 Minn. 239, 96 N.W.2d 243, 245–46 (1959); *Clark v. Oklahoma Elec. Co.*, 144 Okla. 21, 288 P. 935, 936 (1930); *First Nat'l Bank v. Federal Supply Co.*, 260 S.W. 881, 882 (Tex.Civ.App.—Amarillo 1924); *Tonopah*, 97 P. at 638. If the parties intended a series of lienable activities to be but one individual endeavor, a contractor or materialman may wait to file a lien until the conclusion of all of the work. *Kahle*, 96 N.W.2d at 245–46; *Clark*, 288 P. at 936; *First Nat'l Bank*, 260 S.W. at 882; *Tonopah*, 97 P. at 638. As stated earlier, however, whether the parties intended that the later work be part of a continuing contract is a question of fact, which may not be reversed unless clearly erroneous. *Geo, Sedgwick Heating & Air Conditioning Co. v. Riverwood Cos.*, 409 N.W.2d 289, 290 (Minn.Ct.App.1987); *Cushing Country Club v. Boardman Co.*, 381 P.2d 856, 858 (Okla.1963); *Fessman v. Barnes*, 108 S.W. 170, 171 (Tex.Civ.App.1908); *Tonopah*, 97 P. at 638.

C. The Mechanics' Lien Law

In all four states involved, Amtech's argument that it is entitled to mechanics' lien protection under the doctrine of continuing contract fails for each of two reasons. First, even if the continuing contract theory were applicable, the bankruptcy court found as a matter of fact that the parties intended two separate agreements, one for the initial installation (Initial Services) and one for ongoing maintenance and repair (Continuing Services). That finding was not clearly erroneous. Second, the continuing maintenance services Amtech performed are nonlienable. In all four states, ordinary repair and maintenance is simply not protected by the mechanics' lien statutes. The continuing contract theory does not apply where the continuing work is itself nonlienable.

1. *Minnesota*

In Minnesota, "Whoever ... contributes to the *improvement* of real estate by performing labor, or furnishing skill, material, or machinery for any of the purposes hereinafter stated ... shall have a lien upon the improvement, and upon the land on which it is situated or to which it may be removed...." Minn.Stat.Ann. § 514.01 (1990) (emphasis added). The lien expires "at the end of 120 days after doing the last of the work, or furnishing the last item of skill, material, or machinery," unless within this period the party furnishing the improvements files a mechanics' lien statement with the appropriate official office and notifies the owner, an authorized agent, or the person who entered into the contract. *Id.* § 514.08. Thus, successful assertion of a mechanics' lien in Minnesota requires two things: first, that the work be an "improvement," as the cases have defined and interpreted that statutory term, and, second, that the party claiming the lien timely filed and served the lien statement.

██ Amtech did not perfect its mechanics' lien within 120 days after completing the last of the initial installation work. It urges, however, that the Agreement was a continuous, indivisible contract that did not conclude until October 1, 1997. An early Minnesota case expressed the concept of continuing contract as follows:

> Where work, distinct in its nature, is performed at different times, the law supposes it performed under distinct engagements, as where the *work at one time is for building and at another for repairing.* So, where distinct contracts are in fact made, as distinct contracts for different parts of the work, the work done under

each contract must be considered as entire of itself. But when the work, etc., is done or furnished, all going to the same general purpose, as the building of a house, or any of its parts, though such work, etc., be ordered and done at different times, yet if the separate parts form an entire whole, or are so connected together as to show that the parties had it in contemplation that the whole should form but one, and not distinct matters of settlement, the whole account must be treated as a unit, or as being but a single contract.

*Fitzpatrick v. Ernst,* 102 Minn. 195, 113 N.W. 4, 5–6 (1907) (emphasis added) (agreement to perform various repairs and changes to a building: contract divisible); *see also Kahle v. McClary,* 255 Minn. 239, 96 N.W.2d 243, 245–46 (1959). Thus, if a series of lienable activities occurs, such as repeated deliveries of materials on an open account during the construction of a home, the doctrine of continuing contract allows a contractor to wait to file its lien until the last of the work or last delivery made on the entire project.

■■■■ The following factors are viewed as important in determining whether the parties intended one contract or two: (1) the lapse of time following the last major work; (2) whether the subsequent work involved a trifling amount; and, (3) the general circumstances under which the work was done. *Geo, Sedgwick Heating & Air Conditioning Co. v. Riverwood Cos.,* 409 N.W.2d 289, 290–91 (Minn.Ct.App.1987); *Kahle,* 96 N.W.2d at 246. The bankruptcy court specifically found that each of these factors tended to disprove a continuing contract. The evidence supports this finding: (1) the maintenance work was spread out over forty-eight months following the initial work; (2) the monthly charges for the maintenance work were minor in comparison to the monthly amortized charge for the initial installation; and, (3) the maintenance portion could be terminated at any time. Further, there was direct testimony of a Payless witness that he viewed the Initial Services and Continuing Services as discrete. Moreover, the Agreement, while one document, is easily severable into two parts. And, finally, the original installation and the ordinary repair and maintenance are manifestly different types of work, one that

traditionally is lienable (initial installation) and one that is not (continuing maintenance). This is ample support for the court's finding on the parties' intention.

■■■■ Moreover, the continuing repair work Amtech provided is not lienable. This is important because nonlienable activities tagged onto the end of a contract for installation may not extend the time for perfection. The doctrine of continuing contract does not go that far. Improvement is a developed term of art in Minnesota, and elsewhere, meaning work that involves *both* enhancement of capital value of the realty and something permanent in nature. *See, e.g., Kloster–Madsen, Inc. v. Tafi's, Inc.,* 303 Minn. 59, 226 N.W.2d 603, 607 (1975). "In order for a mechanics' lien to be enforceable, the services provided must be lienable improvements as described in the statute . . . . [a]lthough the remedial intent of legislation may be considered, the clear language of a statute cannot be disregarded in the name of pursuing the spirit rather than the letter of the law." *London Constr. Co. v. Roseville Townhomes, Inc.,* 473 N.W.2d 917, 919 (Minn.Ct. App.1991) (citations omitted). Ordinary repairs and maintenance are neither permanent in nature nor enhancing in value, and they are not, therefore, protected by the statute. *See Kloster–Madsen, Inc. v. Tafi's, Inc.,* 303 Minn. 59, 226 N.W.2d 603 (1975) (electrical work that was permanent in nature and enhancing in capital value covered); *see also Hartford Fire Ins. Co. v. Westinghouse Elec. Corp.,* 450 N.W.2d 183, 186 (Minn.Ct.App.1990) ("Replacement of the seal constituted an ordinary repair merely restoring, not increasing, the value and utility of the generator improvement."). This is true even if continuing maintenance and repair is "critical" to the function of the original installation. *Id.* at 186. The work Amtech seeks to protect was thus not lienable in Minnesota.

Indeed, the Minnesota cases cited and relied on by Amtech do not support its point. Rather, they establish the opposite. In each, the later work that the contractor used to argue the continuing contract theory was clearly lienable or was *necessary for the*

completion of the initial improvement. *See Rochester's Suburban Lumber Co. v. Slocumb,* 282 Minn. 124, 163 N.W.2d 303, 309 (1968) (lienable work, the supply of lumber on an open account basis to a construction site, followed by installation of shelving are part of a single contract); *Barrett v. Hampe,* 237 Minn. 80, 53 N.W.2d 803 (1952) (dispute over the construction of a retaining wall that was part of the original contract to build the house); *R.B. Thompson, Jr. Lumber Co. v. Windsor Development Corp.,* 374 N.W.2d 493, 498 (Minn.Ct.App.1985) (subcontractors claiming a mechanics' lien for lienable work done pursuant to several contracts to construct homes, the final step being touch up work on the drywall to complete the initial installation; repair "occasioned by the ordinary process of construction and still within the construction phase of the life of the building" is lienable; by implication, ordinary repair and maintenance following completion of the original improvement is not); *Poured Concrete Foundation, Inc. v. Andron, Inc.,* 529 N.W.2d 506 (Minn.Ct.App.1995) (acid washing, the final step in an overall contract to perform masonry work, was part of original improvement contract).

*Shaw v. Fjellman,* 72 Minn. 465, 75 N.W. 705 (1898), which Amtech cites as its strongest case, is also not helpful to its position. In *Shaw,* a contractor agreed that he would construct a plumbing and heating plant and keep and maintain it for one year from the date of completion. He was to be paid at the end of the year. The contractor completed the work, furnished repair services during the year following substantial completion, and filed his lien statement within the then-required ninety days of the date of the last repair. The Court held that the filing of the mechanics' lien was timely since the contract should be considered one continuing contract. *Shaw* was decided, however, before a material change to Minnesota's mechanics' lien law.

At the time, the mechanics' lien statute did not include the word "improvement" and might have been interpreted to include repairs.[4] In 1905, the statute was amended so as to mirror its current language, which allows a mechanics' lien only for a contribution "to the *improvement* of real estate by performing labor, or furnishing skill, material, or machinery ... for the erection, alteration, repair, or removal of any building."[5] Thus, as previously noted, the change in language necessarily excludes the continuing maintenance and repair work performed by Amtech, even though *Shaw* allowed similar work to create a continuing contract under the old statutory scheme.

The contract was divisible, and the continuing contract theory has no application. Accordingly, Amtech is not entitled to a lien in Minnesota.

### 2. *Oklahoma*

Under Oklahoma law, "[a]ny person who shall ... perform labor, furnish material or lease or rent equipment ... for the erection, alteration or repair of any building, improvement, or structure thereon or perform labor in putting up any fixtures, machinery in, or attachment to, any such building, structure or improvements ... shall have a lien upon the whole of said tract or piece of land, the building and appurtenances." Oklahoma Stat. tit. 42, § 141 (1990). A mechanics' lien statement must be filed "within four (4) months after the date upon which material or equipment used on said land was last furnished or labor last performed under contract...." *Id.* § 142. Amtech did not attempt to perfect its mechanics' lien in Oklahoma until more than a year after it had finished the initial installation work in that state. Thus, once again, it is forced to argue that the contract was a continuing one that did not conclude until October 1, 1997.

---

4. The statute allowed a lien to be filed "for the erection, alteration, repair, or removal of any house ... or other building or appurtenance." Ch. 90, § 6229, 1894 Minn.Laws 1681.

5. Ch. 69, § 3505, 1905 Minn.Laws 701 (emphasis added). While the statute has been amended many times since, it has at all times referred to "improvement." *See* Ch. 69, § 7020, 1913 Minn. Laws 1521; Ch. 285, § 1, 1917 Minn.Laws 421–22; Ch. 229, § 1, 1921 Minn.Laws 280–81; Ch. 69, § 8490, 1923 Minn.Laws 1166; Ch. 274, § 1, 1925 Minn.Laws 323–24; Ch. 69, § 8490, 1927 Minn.Laws 1690–91; Ch. 247, § 1, 1973 Minn. Laws 482–83; Ch. 381, § 1, Minn.Laws 683 (each providing a lien for "whoever contributes to the improvement of real estate ...").

■ Oklahoma case law recognizes the theory of continuing contract. *See, e.g., Cushing Country Club v. Boardman Co.,* 381 P.2d 856, 861–62 (Okla.1963); *Clark v. Oklahoma Elec. Co.,* 144 Okla. 21, 288 P. 935, 936 (1930); *Sherbondy v. Tulsa Boiler & Machinery Co.,* 99 Okla. 214, 226 P. 564, 566 (1924). In fact, the doctrine is articulated in much the same manner as the description given in *Fitzpatrick.*[6]

■ Under Oklahoma law, for a contract to be viewed as one whole, "the terms, nature, and purpose [must] show that it is contemplated and intended that each and all of its parts, material provisions, and consideration are common each to the other and interdependent." *Holden v. DuBois,* 665 P.2d 1175, 1177 (Okla.1983). The Oklahoma Supreme Court has said that the best test is "whether all of the things, as a whole, are of the essence of the contract. That is, if it appeared that the purpose was to take the whole or none, then the contract would be entire; otherwise it would be severable." *Id.* (quoting *Greater Oklahoma City Amusements v. Moyer,* 477 P.2d 73, 76 (Okla.1970)). Of primary importance to consider is the intention of the parties. "A contract may both in its nature and by its terms be severable, and yet rendered entire by the intention of the parties." *Id.* (quoting *Greater Oklahoma City Amusements,* 477 P.2d at 76). "The intention of the parties is to be ascertained from the language used, the subject matter, and a consideration of all the circumstances." *Howard Greene Torpedo Co. v. Big Chief Drilling Co.,* 187 Okla. 321, 102 P.2d 872, 874 (1940) (quoting *Snyder v. Noss,* 99 Okla. 142, 226 P. 319, 323 (1924)). As noted above, in Oklahoma a trial court determination of divisibility is a question of fact reviewed for clear error. *Cushing,* 381 P.2d at 858. As we have already discussed, the bankruptcy court properly addressed all the issues relating to a determination of whether a contract is continuing or divisible. The

record reveals sufficient evidence to support the court's finding that the parties intended a divisible contract. No clear error occurred.

■ In addition, in Oklahoma as in Minnesota, ordinary repairs and maintenance are not lienable services. *Lewis v. Red,* 194 Okla. 432, 152 P.2d 690 (1944) is a leading case. In *Lewis,* plaintiff agreed to make certain repairs and maintain a house over a period of years. The court held that the continuing repairs did not entitle plaintiff to a lien. "[W]hile they maybe said to have been done under one contract ... it is not the type of contract that is the basis for such a lien under our statutes." *Id.* at 692.

And, as in Minnesota, there are an ample number of cases distinguishing nonlienable repair or maintenance from lienable initial construction work in the context of a continuing contract. In *Cushing Country Club v. Boardman Co.,* 381 P.2d 856 (Okla.1963), for example, the court allowed a mechanics' lien for a contractor who finished a pool and later returned to install a flow rate indicator and strainer basket. The court held that the latter work extended the time for filing a lien, but it reached this conclusion only because the work was part of the original installation contract and was not meant to replace defective materials. *Id.* at 857. The court stated emphatically: "[o]rdinarily, the furnishing of labor or the materials to remedy a defect subsequent to completion of contract will not extend the time for filing a lien." *Id.; see also H.E. Leonhardt Lumber Co. v. Ed Wamble Distrib. Co.,* 378 P.2d 771, 774 (Okla.1963); *Norman v. Hearne & Tittle,* 145 Okla. 217, 292 P. 332 (1930); *Taylor Bros. v. Gill,* 126 Okla. 293, 259 P. 236 (1927); *see also Clark v. Oklahoma Elec. Co.,* 144 Okla. 21, 288 P. 935 (1930) (contract to furnish the labor, electrical supplies, material, and equipment necessary to construct a newspaper plant and to continue to supply the same for the operation of the plant; latter work, necessary only for ordinary op-

---

6. It is well settled in this state that, where material is furnished or labor performed for the same general purpose, as in the construction of a building ..., although the material be ordered or labor performed at different times, yet, if the separate parts form an entire whole and are so connected as to show that the parties regarded the separate items furnished, at different times, as being part of the entire account, and not separate accounts, the furnishing of the material or the performance of labor in this manner will be considered as a single contract....

*Clark,* 288 P. at 936.

eration and not part of the original improvement, did not extend the date for filing the mechanics' lien for the original work).

So, too, in Oklahoma, Amtech, having failed to perfect at the conclusion of the installation work, has lost any claim to the protection of a mechanics' lien.

### 3. *Nevada*

The Nevada mechanics' lien statute provides: "[A] person who performs labor upon or furnishes material of the value of $500 or more, to be used in the construction, alteration or repair of any building . . ., has a lien upon the premises and any building, structure and improvement thereon. . . ." NEV-REV.STAT. § 108.222 (1997). "Every person claiming the benefit of [§ 108.222] must record his notice of lien . . . (a) Within 90 days after the completion of the work of improvement; (b) Within 90 days after the last delivery of material by the lien claimant; or (c) Within 90 days after the last performance of labor by the lien claimant, whichever is later." *Id.* § 108.226.

 Amtech failed to file its lien within ninety days of the date of completion of the installation work in Nevada. Like the other states involved, Nevada recognizes the continuing contract theory, upon which Amtech relies to avoid loss of its rights, and it is described in similar fashion.[7]

 In Nevada, "[w]hether a contract is entire, or separable into distinct and independent contracts is a question of the intention of the parties, to be ascertained from the language employed and the subject-matter of the contract." *Linebarger v. Devine,* 47 Nev. 67, 214 P. 532, 534 (1923); *Serpa v. Darling,* 107 Nev. 299, 810 P.2d 778, 781–82 (1991). "The intent of the parties and the object sought to be accomplished controls." *Dredge Corp. v. Wells Cargo, Inc.,* 82 Nev. 69, 410 P.2d 751, 754 (1966). That being acknowl-

edged, the parties' intent as to the continuous nature of a contract presents a question of fact that is sustained if it has "substantial support in the evidence." *Tonopah,* 97 P. at 638. Here, as discussed above, substantial evidence supports the finding of a divisible contract. The bankruptcy court did not err in so finding.

 Also, Nevada, like the other two states discussed, does not provide mechanics' lien protection for ordinary repairs or maintenance. *See Schofield v. Copeland Lumber Yards, Inc.,* 101 Nev. 83, 692 P.2d 519, 520 (1985) ("The object of the lien statutes is to secure payment to those who perform labor or furnish material to *improve* the property of the owner.") (emphasis added); *Peccole v. Luce & Goodfellow, Inc.,* 66 Nev. 360, 212 P.2d 718, 727 (1949) ("trivia," "items omitted," or "repairing defects or inferior workmanship" would not be lienable); *Didier v. Webster Mines Corp.,* 49 Nev. 5, 234 P. 520, 524 (1925) ("The general theory upon which liens to laborers, mechanics, and materialmen are given is that by the labor, or use of the material, the property has been *enhanced in value.*") (emphasis added). The maintenance and repair Amtech performed simply was not part of the improvement; rather, it constituted only nonlienable repairs and maintenance.

And, once again, the cases cited by Amtech disprove its point. Each involves work necessary to complete the original project. In *Peccole,* the court allowed a mechanics' lien claim to be filed for varnishing done to a counter after a break in work. The court made clear, however, that the varnishing completed the project, and it would not have applied the continuing contract theory to the situation if the contractor had merely been repairing his prior completed work. *Peccole,* 212 P.2d at 727. In *Richmond Machinery Co. v. Bennett,* 48 Nev. 286, 229 P. 1098 (1924), another case cited by Appellant, the

---

7. When work or material is done or furnished, all going to the same general purpose, as the building of a house or any of its parts, though such work be done or ordered at different times, yet if the several parts form an entire whole or are so connected together as to show that the parties had in contemplation that the whole should form but one, and not distinct matters of

settlement, the whole account must be treated as a unit, or as being but a single contract.

*Tonopah Lumber Co. v. Nevada Amusement Co.,* 30 Nev. 445, 97 P. 636, 638 (1908); *see also Peccole v. Luce & Goodfellow, Inc.,* 66 Nev. 360, 212 P.2d 718, 727 (1949); *Gaston v. Avansino,* 39 Nev. 128, 154 P. 85, 87 (1915).

work involved went to actual, correct completion of the installation of a fixed pulley system. In *Tonopah*, 97 P. at 638, the work completed the original plans; a break in work resulted only from a lack of funds on the part of the building's owner.

Amtech failed to timely perfect its lien in Nevada. It cites no authority, and we find none, which extends a continuing contract theory to a situation where the improvement work is completed (including touch up repairs required to finish the project), yet ongoing ordinary repairs and maintenance extend the time for filing of a mechanics' lien. Accordingly, it has not perfected a mechanics' lien in Nevada.

### 4. Texas

The Texas Property Code provides the statutory basis for a claim to a mechanics' lien. Texas law provides: "(a) A person has a lien if: (1) the person labors, specially fabricates material, or furnishes labor or materials for construction or repair in this state of: (A) a house, building, or improvement . . . and (2) the person labors, specially fabricates the material, or furnishes the labor or materials under or by virtue of a contract with the owner or the owner's agent, trustee, receiver, contractor, or subcontractor." TEX. PROP.CODE ANN. § 53.021 (West 1995). However, Texas law approaches the time within which liens must be filed in a distinct manner. All persons who claim a lien "must file an affidavit with the county clerk of the county in which the property is located . . . not later than the 15th day of the fourth calendar month after the day on which the indebtedness accrues." *Id.* § 53.052(a). In an effort to clearly provide protection both for original contractors and also for subcontractors and materialmen, the law distinguishes each of their filing deadlines by defining "accrual" differently depending on which type of contract is involved.[8] For

subcontractors and materialmen, indebtedness accrues "on the last day of the last month in which the labor was performed or the material furnished." *Id.* § 53.053(c). Indebtedness to an original contractor, such as that involved in this case, accrues "on the last day of the month in which the original contract has been completed, finally settled, or abandoned." *Id.* § 53.053(b)(2). Texas also provides for a "retainage lien." During the progress of work, an owner must retain ten percent of the contract price or the value of the work to secure payment for materialmen and subcontractors. *Id.* §§ 53.101–53.102. A retainage lien must be filed not later than the 30th day after the work is "completed." *Id.* § 53.103. "Completion" is defined to mean "the actual completion of the work, including any extras or change orders reasonably required or contemplated under the original contract; other than warranty or repair work." *Id.* § 53.106(e).

Amtech[9] asserts that the Texas statute, which allows a contractor who has an original contract with an owner to delay filing its lien until the contract is "completed," is designed to encourage such contractors to wait until their contracts are fully completed before they take steps to perfect. Accordingly, Amtech urges that Texas public policy, as well as the language of the statute itself, require a much more restrictive view of whether a contract such as this one may be found divisible. Amtech also asserts that, using this more restrictive view of the fact finder's license, the trial court's finding on the issue was clearly erroneous. Finally, while asserting that the issue is irrelevant, Amtech takes the position that in Texas, ordinary repairs of the type performed by Amtech are lienable. According to Amtech, "[T]here is no 'enhancement test' under the Texas Property Code." Amtech cites no Texas authorities for these rather remarkable arguments.

8. *See* Eldon L. Youngblood, *Mechanics' and Materialmen's Liens in Texas*, 26 S.W.L.J. 665, 666 (1972). In its attempt to protect subcontractors and materialmen as well as original contractors, "the procedures prescribed by the current statutes, particularly procedures for perfecting the subcontractor's lien, have become vastly more complex and unwieldy." *Id.; see also* Sara E. Dysart, *USLTA: Article 5 "Construction Liens"*

*Analyzed in Light of Current Texas Law on Mechanics' and Materialmen's Liens*, 12 ST. MARY'S L.J. 113, 116 (1980).

9. Actually, Amtech deferred this portion of the appeals to Amicus, International Association of Lighting Management Companies, which made the arguments on behalf of Amtech.

Payless responds that the mere fact that the Texas statutory mechanics' lien staggers the commencement of the date for perfection, requiring a subcontractor to perfect when it finishes its work, but allowing the general contractor to defer perfection until the general contract is completed, does not change otherwise applicable basic rules. It asserts that the issue of the divisibility of a contract remains one of fact, reviewable under a clearly erroneous standard. It further asserts that the continuing contract theory does not apply to these facts because the maintenance services on which Amtech relies are not lienable. We agree with Payless.

 Texas accepts the general view of divisible contracts: no one test or rule of law is determinative as to whether a contract is entire or divisible. *Johnson v. Walker*, 824 S.W.2d 184, 187 (Tex.App.—Fort Worth 1991); *St. John v. Barker*, 638 S.W.2d 239, 243 (Tex.App.1982); *Chapman v. Tyler Bank & Trust Co.*, 396 S.W.2d 143, 146 (Tex.Civ. App.—Tyler 1965). The determination depends primarily on the intention of the parties, the subject matter of the agreement, and the conduct of the parties. *Walker*, 824 S.W.2d at 187; *St. John*, 638 S.W.2d at 243; *Chapman*, 396 S.W.2d at 146–47. In general, Texas cases have held that a contract is divisible when the performance by one party consists of several distinct and separate items, and the price paid by the other party is apportioned to each item. *Walker*, 824 S.W.2d at 187; *Click v. Seale*, 519 S.W.2d 913, 918 (Tex.Civ.App.—Austin 1975); *Chapman*, 396 S.W.2d at 147. If there is a single assent to a whole transaction involving several things, a contract is entire. If there is a separate assent to each of the several things involved, it is divisible. *Walker*, 824 S.W.2d at 187; *St. John*, 638 S.W.2d at 243–44. However, the fact that two agreements are embraced in one instrument will not make the writing entire and indivisible. *Click*, 519 S.W.2d at 918. In the end, the intent of the parties, as demonstrated by the language used, is controlling. *Blackstock v. Gribble*, 312 S.W.2d 289, 292–93 (Tex.Civ.App.—Eastland 1958); *Read v. Gibson & Johnson*, 12 S.W.2d 620, 622 (Tex.Civ.App.—Eastland 1928).

 As discussed above, the bankruptcy court did not clearly err in finding that the Agreement was divisible. The language and the subject matter of the Agreement suggest the parties intended a divisible contract because of the clear distinction between the initial services and the continuing services. In addition, the price is apportioned between the two separate parts of the Agreement, which also indicates a divisible contract. *See Walker*, 824 S.W.2d at 187; *Click*, 519 S.W.2d at 918; *Chapman*, 396 S.W.2d at 147. Finally, the fact that one instrument contains both agreements does not prevent a finding of a divisible contract. *Click*, 519 S.W.2d at 918. For instance, in *St. John*, the parties entered a single agreement to remodel a house; however, the court found that the agreement actually involved several separate agreements to do many things at different times. *St. John*, 638 S.W.2d at 243–44. The Agreement in this case is similar in that it involves essentially separate agreements to do different things at different times. By its nature, the Agreement is divisible. Given these factors, all favoring a finding of divisibility under Texas law, the bankruptcy court's decision was not clearly erroneous. Because the indebtedness accrued upon completion of the initial services portion of the contract, and the lien was not filed by the fifteenth day of the fourth month thereafter, the bankruptcy court properly sustained the objection to Appellant's secured claim.

 We also find no support for Amtech's argument that there is no "enhancement" test for successful assertion of a Texas statutory mechanics' lien. In Texas, ordinary repairs and maintenance are not lienable activities. "A mechanic's lien is defined as a lien created by law on real estate, and the improvements thereon, to secure persons who, within the intent of the law, have labored or furnished material, machinery, fixtures, or tools to erect or repair the improvements." *Efficient Energy Systems, Inc. v. J. Hoyt Kniveton, Inc.*, 631 S.W.2d 538, 539 (Tex.App.—El Paso 1982); *see also Hayek v. Western Steel Company*, 478 S.W.2d 786, 794 (Tex.1972) (mechanics' liens designed to protect labor and materials that enhance the value of property to the benefit of the own-

er). We find no Texas authority, and Amtech cites none, that would take Texas out of normal parameters on this issue. Secondary sources, similarly, provide not the least hint of support for Amtech's arguments. *See* Youngblood, *supra,* at 671–75; Dysart, *supra,* at 113–14; L. Kelly Jones, *Texas Mechanics' And Materialmen's Lien Laws: A Guide Through the Maze,* Texas Bar Journal, March 1985, at 318.

A case closely on point is *TDIndustries, Inc. v. NCNB Texas Nat'l Bank,* 837 S.W.2d 270 (Tex.App.1992). *TDIndustries* involved a claim by a subcontractor for a retainage lien. The Texas court looked to the definition of "completed" in § 53.106(e) and found that completion had not occurred until the very last item of work was done on the initial original contract. Amtech views the decision as irrelevant because the definition in § 53.106(e) is specifically referred to as being applicable only to retainage liens. But the point made in *TDIndustries,* that ordinary repair is to be distinguished from the initial improvement, is well accepted and is applicable.

Thus, while the Texas statutory mechanics' lien provides a slightly more complicated sequence for perfection, Texas is similar to the other three states. The time for timely perfecting commenced at the completion of the initial installation. Amtech did not timely perfect. The continuing maintenance services do not extend its time for timely perfection.

### D. Conclusion as to First Appeal

In conclusion, we find no clear error in the bankruptcy court's finding that the parties intended a divisible contract, one for installation and one for ongoing ordinary repairs and maintenance. The bankruptcy court correctly determined that Amtech failed to timely perfect a mechanics' lien in Minnesota, Oklahoma, Nevada, and Texas. The court properly held that parties may not, by contract, alter mechanics' lien statutory require-

ments. To allow Amtech to prevail on a theory of continuing contract under the facts presented would allow it to expand by contract the statutory parameters of the mechanics' lien laws in each of those states. Finally, we agree with the bankruptcy court's view of Amtech's argument regarding a potential suit for slander of title. Amtech could have easily protected itself by obtaining mortgages.

### APPEAL FROM THE JULY 17, 1998, ORDER

Finally, we turn to Amtech's appeal from the bankruptcy court's order denying reconsideration of the claim. Amtech sought reconsideration of the May 8, 1998, decision disallowing it a secured claim in Texas because Amtech discovered a new theory of recovery that it wanted to establish.

### A. The Texas Constitutional Lien

 The Texas constitutional lien is not obscure.[10] It is announced in very basic treatises on the subject of Texas mechanics' lien law. The Texas constitutional lien is distinct from and exists independent of the statutory mechanics' lien. *Ralph M. Parsons Co. v. South Coast Supply Co. (In re A & M Operating Co.),* 182 B.R. 997, 1000 (E.D.Tex.1995); *see also* 51 Tex.Jur.3d *Mechanics' Liens* § 39 (1986); Eldon L. Youngblood, *Mechanics' and Materialmen's Liens in Texas,* 25 S.W.L.J. 665, 687 (1972). Thus, the right to claim a constitutional lien does not depend on compliance with the statutory procedures for perfecting a mechanics' lien; the constitutional lien is self-executing. *A & M Operating,* 182 B.R. at 1000; *see also* 51 Tex.Jur.3d *Mechanics' Liens* §§ 2, 39; Youngblood, *supra,* at 687–88. However, entitlement to a constitutional lien requires that the party claiming the lien be in privity of contract with the owner of the real property involved. *A & M Operating,* 182 B.R. at 1000; *see also* 51 Tex.Jur.3d *Mechanics'*

---

**10.** During oral argument on the motion to reconsider, counsel for Amtech attributed his failure to learn of the constitutional lien to inadequate research conducted by the second year associate who had been assigned to research the Texas law, and to the fact that the two "treatises" he looked to, Martindale Hubbel's Texas Law Digest and the Commerce Clearing House Secured Transactions Guide, did not mention it. These were the only "treatises" he had in his law library.

*Liens* § 2: Youngblood, *supra*, at 688. That is, an original contractor can claim the lien, but a subcontractor cannot. *A & M Operating*, 182 B.R. at 1001; *see also* Youngblood, *supra*, at 688. In addition, one cannot enforce a constitutional lien against a bona fide purchaser for value without notice. *A & M Operating*, 182 B.R. at 1001; *see also* 51 Tex.Jur.3d *Mechanics' Liens* § 39; Youngblood, *supra*, at 688. As a leading treatise points out, the careful practitioner asserts both types of liens—the constitutional lien serving as a backup to the statutory lien in case of an error in perfection. Youngblood, *supra*, at 689.

When it filed its claim and tried its case, Amtech did not assert that it was entitled to a constitutional lien. It tried its case and introduced its evidence on a wholly different theory. Because Payless is a bona fide purchaser, *see* 11 U.S.C. § 544(a)(3) (1994), the parties agree that, if the lien applies at all, it can only apply as to personalty that is not permanently affixed to the realty. Now, having "discovered" this new way of asserting a lien, Amtech insists that it should have a constitutional lien for loose light bulbs and other personalty delivered to the Texas locations and for any of the installed lamps, ballasts, and similar materials that it initially installed and that could be removed without damage to the realty. Amtech introduced no evidence on the possible value of any unaffixed personalty nor any evidence as to the extent, if at all, that the installed lamps, fixtures, ballasts and similar supplies could be removed without damage to the realty. While it suggests that proof of the value of this portion of the initial work would not be extensive, that seems doubtful, and, in any event, it assumes that successful assertion of the constitutional lien would require reopen-

ing discovery and holding a new hearing to deal with valuation.

**B. SECTION 502(J)**

 Section 502(j) of the Bankruptcy Code provides, in relevant part: "A claim that has been allowed or disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed according to equities' of the case." 11 U.S.C. § 502(j); *see also* Fed.R.Bankr.P. 3008. Reconsideration of a claim may be requested at any time. *Employment Sec. Div. v. W.F. Hurley, Inc. (In re W.F. Hurley, Inc.)*, 612 F.2d 392, 394 (8th Cir.1980); *see also United States v. Zieg (In re Zieg )*, 206 B.R. 974, 978 (D.Neb.1997) ("[A] motion for reconsideration can be filed at any time before the case is closed.").[11]

 When a motion to reconsider is made after expiration of the time to appeal, as in this case, it is treated as a motion for relief from judgment under Federal Rule of Bankruptcy Procedure 9024. *Abraham v. Aguilar (In re Aguilar )*, 861 F.2d 873, 874 (5th Cir.1988); *S.G. Wilson Co. v. Cleanmaster Indus., Inc. (In re Cleanmaster Indus., Inc.)*, 106 B.R. 628, 630 (9th Cir. BAP 1989). Rule 9024 provides that Federal Rule of Civil Procedure 60 applies in all bankruptcy cases. Fed.R.Bankr.P. 9024. In essence, then, Rule 60(b) helps to define the term "cause" in § 502(j) and provides the applicable criteria for reconsidering claims. *Hurley*, 612 F.2d at 396 n. 4; *see also Colley v. National Bank of Texas (In re Colley )*, 814 F.2d 1008, 1010 (5th Cir.1987) (citing *Hurley* ); *Cleanmaster*, 106 B.R. at 630. In relevant part, Rule 60(b) allows a court to relieve a party from an order for "mistake, inadvertence, surprise or excusable neglect." Fed.R.Civ.P. 60(b)(1). The parties agree that excusable neglect is the appropriate standard to apply in this circumstance.

---

11. At one point below the parties argued over whether the bankruptcy court even had jurisdiction to consider the motion to reconsider while the first appeal was pending. The pending appeal from the May 8, 1998 Order disallowing the claim did not divest the bankruptcy court of jurisdiction to hear the motion to reconsider. While an appeal is pending, such a motion may be considered on its merits and denied. *Brode v. Cohn*, 966 F.2d 1237, 1240 (8th Cir.1992); *Winter v. Cerro Gordo County Conservation Board,*

925 F.2d 1069, 1073 (8th Cir.1991); *Kieffer v. Riske (In re Kieffer–Mickes, Inc.)*, 226 B.R. 204, 209–10 (8th Cir. BAP 1998). A separate appeal may thereafter be taken. *Brode*, 966 F.2d at 1240; *Winter*, 925 F.2d at 1073; *Kieffer*, 226 B.R. at 210. Accordingly, the bankruptcy court in this case properly exercised its jurisdiction to hear the motion to reconsider the claim and to deny it. *See Brode*, 966 F.2d at 1240; *Winter*, 925 F.2d at 1073, *Kieffer*, 226 B.R. at 209–10.

## C. STANDARD OF REVIEW

We review the denial of a motion for reconsideration under an abuse of discretion standard. *See, e.g., Halverson v. Estate of Cameron (In re Mathiason )*, 16 F.3d 234, 239 (8th Cir.1994); *see also Employment Sec. Div. v. W.F. Hurley, Inc. (In re W.F. Hurley, Inc.)*, 612 F.2d 392, 396 (8th Cir.1980); *Colley v. National Bank of Texas (In re Colley )*, 814 F.2d 1008, 1010 (5th Cir.1987). An abuse of discretion will only be found if the lower court's judgment was based on clearly erroneous factual findings or erroneous legal conclusions. *Barger v. Hayes County Non–Stock Co-op (In re Barger )*, 219 B.R. 238, 243 (8th Cir. BAP 1998) (citing *Mathenia v. Delo,* 99 F.3d 1476, 1480 (8th Cir.1996)).

## D. EXCUSABLE NEGLECT

The seminal case on excusable neglect is *Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. Partnership,* 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). In *Pioneer,* creditors of a Chapter 11 debtor failed to timely file their proofs of claim and sought to extend the deadline, alleging excusable neglect. The attorney for the creditors pointed to the fact that he was experiencing great upheaval in his law practice at the time of the bar date. The court also noted that the notice of the bar date was not made in the usual manner of most bankruptcy cases; instead, it was hidden in the notice of the meeting of creditors. Rejecting the theory that excusable neglect requires circumstances outside the party's control, the Supreme Court affirmed the finding of excusable neglect.

From *Pioneer,* we derive the following rules. First, excusable neglect encompasses both simple, faultless omissions and omissions caused by carelessness. *Pioneer,* 507 U.S. at 388, 113 S.Ct. 1489. The determination as to whether neglect is excusable is an equitable one, taking into account all relevant circumstances surrounding the party's omission. *Id.* at 395, 113 S.Ct. 1489. Factors to consider include (1) the danger of prejudice to the debtor; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in good faith. *Id.*

The Eighth Circuit has interpreted the standards articulated by *Pioneer* on at least three occasions. In the most recent, *Johnson v. Dayton Elec. Mfg. Co.,* 140 F.3d 781 (8th Cir.1998), the defendant in a products liability action moved to set aside an entry of default judgment. The defendant had failed to file an answer due to miscommunication with its insurer as to who was going to pursue the matter. In applying the *Pioneer* factors, the court stated that it would focus heavily on the blameworthiness of the defaulting party, seeking to distinguish between contumacious or intentional delay and a marginal failure to meet deadlines. *Id.* at 784. The court found that the defendant's actions were only a marginal failure to meet deadlines, a failure the defendant cured within one day of discovering the mistake. *Id.* at 784–85.

*Jones Truck Lines, Inc. v. Foster's Truck & Equip. Sales, Inc. (In re Jones Truck Lines, Inc.)*, 63 F.3d 685 (8th Cir.1995), also applied *Pioneer* in a default judgment setting. In this case, the defendant in a preferential transfer action failed to file a timely answer. The attorney for the defendant stated that he was waiting to file the answer in order to save money while pursuing an out of court settlement and that he incorrectly applied the local rule from another district that did not require an answer until after the pre-trial conference. The Eighth Circuit reversed the default judgment, finding that the Bankruptcy Court had misapplied the *Pioneer* factors. Specifically, the court noted that the attorney's actions could properly be construed as a mistake and in no way amounted to a willful flaunting of a deadline. *Id.* at 687–88.

Finally, *Harlow Fay, Inc. v. Federal Land Bank (In re Harlow Fay, Inc.)*, 993 F.2d 1351 (8th Cir.1993), presents a case where the court dismissed an appeal for failure to timely file a brief. In moving for reconsideration, the party cited excusable neglect, specifically noting the fact that financial pressures had forced its attorney to relocate and

reduce its staff of attorneys. Finding that these circumstances did not establish excusable neglect, the court specifically referred to *Pioneer*, which gave "little weight to the fact that counsel was experiencing upheaval in his law practice." *Id.* at 1352–53.

■ We now turn to an application of the *Pioneer* factors, as interpreted and developed in this circuit's case law. In this case, the fourth *Pioneer* factor, Amtech's good faith is not questioned. However, the parties dispute the applicability of the remaining three *Pioneer* factors.

For both of the first two *Pioneer* factors, prejudice to the nonmoving party and impact on efficient judicial administration, the bankruptcy court concentrated on the fact that it had already heard and decided the matter once. Although the doctrines of res judicata and collateral estoppel do not strictly apply in a motion for reconsideration,[12] the bankruptcy court did not abuse its discretion in finding that the principles underlying these doctrines were relevant and that rehearing the matter would prejudice both the Debtor and efficient judicial administration.

This is not the typical case where courts find a lack of prejudice when a default judgment has been entered or a filing deadline has been missed. *See, e.g., Johnson v. Dayton Elec. Mfg. Co.,* 140 F.3d 781 (8th Cir. 1998) (default judgment); *Jones Truck Lines, Inc. v. Foster's Truck & Equip. Sales, Inc. (In re Jones Truck Lines, Inc.),* 63 F.3d 685 (8th Cir.1995) (default judgment). The present case does not involve a simple missed deadline or an untimely failure to respond to the objection to a claim. Instead, Amtech responded in a timely fashion. The present case involves counsel's error in failing to read the law, failing to present all of its arguments, and trying its case without determining all of the evidence that should be presented to present all possible theories. A party may not try its case on one theory, lose, and seek to relitigate on another. *See, e.g., Webb v. James,* 147 F.3d 617, 622 (7th Cir.1998) (attorney's failure to conduct research not excusable neglect); *Allmerica Fin. Life Ins. & Annuity Co. v. Llewellyn,* 139 F.3d 664, 665–66 (9th Cir.1997) (failure of attorney to assert an affirmative defense did not justify relief from judgment); *Cashner v. Freedom Stores, Inc.,* 98 F.3d 572, 577 (10th Cir.1996) (relief from judgment not available to allow party to assert arguments or evidence that were available at the time of the original argument); *Mendell v. Gollust,* 909 F.2d 724, 731 (2d Cir.1990) (counsel's ignorance of the law did not mandate relief from judgment).

■ Further, in considering the third factor, the reason for the delay, we must focus heavily on the blameworthiness of the moving party. *Johnson,* 140 F.3d at 784. While *Pioneer* holds that excusable neglect does not require a reason outside the control of the moving party, whether the circumstances are in its control is still a relevant factor to consider. *Pioneer,* 507 U.S. at 388, 395, 113 S.Ct. 1489. We must seek to distinguish between contumacious delay and a marginal failure to meet deadlines. *Johnson,* 140 F.3d at 784. The bankruptcy court found that the reason for the delay in this case was Amtech's failure to retain counsel with knowledge of Texas mechanics' lien law. This was clearly within Amtech's control. While Amtech's actions are not manifestly contumacious, neither were they a "marginal failure" to meet deadlines. As indicated, the Texas constitutional lien would have appeared as an alternative form of relief in any marginally careful search of Texas law. And, to allow it to be asserted now would require going back to square one in the evidentiary hearing.

---

12. Amtech cites *In re Yagow,* 62 B.R. 73 (Bankr. D.N.D.1986), to support its contention that the court inappropriately considered the fact that the issue had already been heard and decided once. *Yagow* involved a dispute over the validity of a lien that debtors had acknowledged was valid during two prior hearings. The creditor asserted that res judicata and collateral estoppel prevented the court from reconsidering the lien. The court found that, even if the prior orders were final and subject to res judicata and collateral estoppel, § 502(j) allowed the court to reconsider the claim. However, in its determination of whether to reconsider the claim, the court relied heavily on the fact that valuable court time had not been previously expended in deciding the matter. *Id.* at 78.

### E. CONCLUSION AS TO SECOND APPEAL

In sum, the bankruptcy court did not abuse its discretion in finding that three of the four *Pioneer* factors weighed against finding excusable neglect. Thus, Appellant did not establish the cause necessary to reconsider the claim under § 502(j).[13]

### CONCLUSION

ACCORDINGLY, the decision of the bankruptcy court is AFFIRMED.

---

13. We note that the circumstances of this case do not present the type of situation where consideration of an issue for the first time on appeal is appropriate. *Singleton v. Wulff,* 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976): *United States Dept. of Labor v. Rapid Robert's Inc.,* 130 F.3d 345, 348 (8th Cir.1997); *First Bank Investors' Trust v. Tarkio College,* 129 F.3d 471, 477 (8th Cir.1997); *Kelley v. Crunk,* 713 F.2d 426, 427 (8th Cir.1983). Amtech acknowledges and the bankruptcy court was convinced, as are we, that Amtech would need to present additional evidence to prove the extent of its constitutional lien, i.e., the value of the unattached or removable personalty. It merely quibbles over how much new discovery or evidence would be needed. Given that the outcome after such further evidence is uncertain, and that the theory was neither advanced nor proven, the claim may not be raised for the first time on appeal. *Singleton,* 428 U.S. at 121, 96 S.Ct. 2868; *Rapid Robert's,* 130 F.3d at 348; *First Bank,* 129 F.3d at 477; *Kelley,* 713 F.2d at 427.